**William A. RANSOM, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 229–84C.**

United States Claims Court.

June 13, 1989.

See also, 8 Cl.Ct. 646.

Richard M. Norman, Ventura, Cal., for plaintiffs. Muegenburg, Norman & Dowler, of counsel.

Cheryl S. Rome, with whom were Asst. Atty. Gen. John R. Bolton and David M. Cohen, Washington, D.C., for defendant. Major Scott Bagley, HQUSAF–JACN, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

The case is presently before the court on defendant's motion to dismiss Count I and for summary judgment as to Count II, and on plaintiff's cross-motion for summary judgment as to Count I, and for partial summary judgment as to Count II. The two counts of the complaint raise the fol-

lowing questions: Count I) When the United States is obligee on a bid bond, is it contractually obligated to pass along to the bid bondsmen information relevant to the risk being secured, so that if it does not do so, the bondsmen are relieved of their subsequent assumption of duties under performance and payment bonds? Count II) In the absence of a notification to the Government by performance and payment bond sureties, can the Government be obligated to divert progress payments from the contractor to the sureties? For the reasons set forth below, both questions above are answered in the negative. Defendant's motion to dismiss is converted to a motion for summary judgment, and defendant is granted summary judgment on both counts of the complaint.

## FACTS

On June 4, 1980, the United States solicited bids to rehabilitate approximately 250 housing units located at Edwards Air Force Base, California. A. Marvin Diversified, Inc. ("Marvin") submitted a bid and bid bond on August 22, 1980. Plaintiffs Robert D. Nesen and William A. Ransom were named as individual sureties on Marvin's bid bond. Nesen and Ransom executed affidavits indicating their individual net worths as $4,101,000 and $4,115,000, respectively.

Bid opening was publicly conducted on August 22, 1980. There were no representatives present for Marvin or the sureties. Marvin was the lowest bidder, with a basic bid of $3,695,548. The next lowest bid was $4,960,100, submitted by The Triax Company. The Government's estimate of the contract cost, plus profit, was $5,464,115.

At the request of the procuring contract officer Frederick R. Von Steuben, Contract Specialist June Keaton telephoned Marvin's office and requested confirmation of Marvin's bid. Marvin responded by letter to Von Steuben dated August 25, 1980, confirming its basic bid as correct. Von Steuben then followed with a written request on August 27, 1980 that Marvin review and confirm its bid or notify defendant if it found a mistake had been made. Plaintiffs

were not sent a copy of that letter. Plaintiffs also were not notified by the defendant that on September 2, 1980, it received a letter from the second low bidder, Triax, reciting, among other things, that "it would be virtually impossible for the apparent low bidder to comply with the requirements of the contract drawings and still realize a reasonable profit."

By letter dated September 1, 1980, Marvin informed the Government that after further checking it had discovered a substantial error in its bid, and Marvin requested a $496,324 increase in its bid to correct the error. By letter dated September 15, 1980, Marvin informed the Government that its error actually amounted to $396,440 and requested instead that the bid be increased by that amount.

By memorandum dated September 19, 1980, the Government's contract management section reported to its procurement office that a bona fide error had been made in Marvin's bid. Von Steuben concurred and recommended to the Air Force Judge Advocate that Marvin be allowed to amend its bid as requested. The Judge Advocate concluded that clear and convincing evidence supported a determination of bona fide error, but he held that clear and convincing evidence of the intended amount of the bid was lacking. Consequently, Marvin was permitted to withdraw its bid but was not allowed to amend it. Von Steuben notified Marvin by letter dated September 23, 1980 of the Judge Advocate's determination. There is no evidence that a copy of this letter was sent to plaintiffs at the time.

Marvin responded by letter dated September 24, 1980 that it would not withdraw its original bid of $3,695,548, but instead would perform all of the original contract requirements for that price. Marvin also sought to reserve the right to seek relief either during the period of construction or at the completion of the job for the amount previously requested.

The Government conducted a pre-award investigation into Marvin's ability to complete the contract. A report entitled "Pre-Award Survey of Offerer," dated September 17, 1980 was prepared after the investigation, wherein the Defense Logistics Agency's Defense Contract Administration Services Management Area ("DCASMA") rated Marvin as satisfying all applicable requirements, including technical, production, and financial capability, performance record, and ability to meet the required schedule.

The Government accepted Marvin's bid on September 25, 1980, and Contract No. F04700–80–C–0127 was awarded to Marvin on September 29, 1980. The contract was for the basic bid price of $3,695,548 and for optional work in the amount of $418,322, for a total contract price of $4,113,880.

On September 25, 1980, plaintiffs executed performance and payment bonds which promised that in the event Marvin defaulted in its performance of the contract or failed to pay its laborers and suppliers plaintiffs would be responsible for (1) completing the contract or paying the Government's cost of doing so and (2) paying Marvin's laborers and suppliers. The performance bond had a penal sum of $4,113,-880 and the payment bond had a penal sum of $1,645,522. The payment bond was supported by the affidavits of the sureties and bank certificates of sufficiency.

Marvin was given notice to proceed with work on October 10, 1980. Work on the 250 housing units was to be completed in six increments, the first increment of 47 units to be completed on February 17, 1981.

During the course of performance, Marvin reported differing site conditions, problems with the specifications, and Government-caused delays. Additionally, there were many requests for change orders. In turn, certain Government personnel expressed dissatisfaction with aspects of Marvin's performance and its progress. Colonel Olin H. Bradley, Director of Contracting, issued a determination regarding these matters on April 28, 1981, which noted the following: the Government had contributed to the delays encountered by the contractor and had placed the completion date behind schedule; there had been numerous change orders; a revised completion schedule was being developed; contract payments and progress would be monitored; and, finally,

unless the contractor indicated a willingness to increase progress to return to schedule, there was no intention to assign it additional housing units beyond the 47 units that comprised the first increment of work. Nevertheless, adjustments increasing the contract price by $53,404.60 and extending the time for completion of the first construction increment to July 17, 1981, were made by modifications Nos. P00002 and P00003, dated June 8 and May 29, 1981, respectively.

Marvin received progress payments totalling $1,147,772.52 through June 8, 1981. After June 8, no further progress payments were made. The contractor failed to complete any of the first 47 units, and on June 29, 1981, Marvin received a 10–day notice to cure defects. On July 24, 1981, the contracting officer directed Marvin to show cause why the contract should not be terminated for default. A copy of this notice was sent to and received by each of the sureties. The sureties sent a telegram on August 3, 1981 requesting that all payments be withheld. That was followed up by a letter dated August 11, 1981, requesting that payments be made jointly to the contractor and a bank, and sent directly to the bank. Marvin's right to perform under the contract was terminated on September 8, 1981, and the contract was terminated for default on October 26, 1981.

Plaintiffs agreed to take over and complete the contract. The takeover agreement was executed on January 4, 1982. The takeover price was $4,167,284.60, which included adjustments of $53,404.60. Of this amount, $3,019,512.08 remained undisbursed.

On August 23, 1982, plaintiffs submitted a claim against the Government in the total amount of $1,383,229.15, plus an unspecified additional amount for completion of the contract at a cost in excess of the balance of contract funds remaining unpaid. Plaintiffs later amended their claim to seek a total amount of $3,024,699. The claim as amended was denied by the contracting officer in his final decision dated October 25, 1983.

Plaintiffs filed their complaint[1] on May 7, 1984. The complaint, as amended, consists of two counts. In Count I plaintiffs seek $2,650,000 for breach of an asserted express or implied contract arising between them and the Government upon execution of the bid bond by which the Government covenanted to act in good faith and fairly in dealing with plaintiffs. They allege that the Government's failure to notify them of Marvin's option to withdraw from the bid bond and of other related facts was a breach of the contract. In Count II, plaintiffs assert the existence of an express contractual relationship with the defendant arising out of the performance and payment bonds. They specifically allege the defendant's last payment to Marvin was a breach of defendant's duty to deal fairly and in good faith with plaintiffs and to consider plaintiffs' interests. They seek recovery of $413,914.80 as the amount of improper contract progress payments made by the Government. Neither count is predicated on a contractual relationship arising out of the takeover agreement.

## DISCUSSION

### Count I

This court has Tucker Act jurisdiction to hear a "claim ... founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1982). In Count I plaintiffs claim that an express or implied contract arose between them, Marvin, and the Government upon execution of the bid bond, and that the covenant implied in any contract to deal fairly and in good faith was breached by the Government's conduct. Defendant has moved to dismiss Count I for lack of subject matter jurisdiction, RUSCC 12(b)(1), arguing that since the facts do not give rise to a contract, the court cannot hear the claim. Under the circumstances, defendant's motion is more

---

1. Defendant's first motion for summary judgment was granted on May 21, 1987, on the grounds that plaintiffs had not properly certified their claim to the Air Force Contracting Officer. The Court of Appeals for the Federal Circuit reversed and remanded by decision dated January 7, 1988.

properly characterized, however, as a motion to dismiss for failure to state a claim upon which relief can be granted. RUSCC 12(b)(4). Where, as here, the jurisdictional facts alleged are closely intertwined with the merits, the preferred practice is to assume subject matter jurisdiction exists and address the merits. *Marvel Engineering Co. v. United States*, 14 Cl.Ct. 614, 620 (1988) (citing *Jones v. State of Georgia*, 725 F.2d 622 (11th Cir.), *cert. denied*, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 316 (1984)); *see Do–Well Machine Shop, Inc. v. The United States*, 870 F.2d 637, 639–40 (Fed.Cir.1989) (quoting *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), "Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover...."); *see also W.R. Cooper General Contractor v. United States*, 843 F.2d 1362 (Fed.Cir.1988).

Since materials beyond the pleadings are contained in the parties' voluminous appendices, defendant's motion to dismiss will be treated as a motion for summary judgment. RUSCC 12(b); *Thoen v. United States*, 765 F.2d 1110, 1113 (Fed.Cir.1985). During oral argument the court notified the parties it would consider the motion to dismiss Count I under RUSCC 56 and asked if either party wished to supplement the record in accordance with RUSCC 12(b). Both responded that they had no further materials to add. They agree that there are no facts in dispute. Count I can thus be resolved through summary judgment.

The purpose of a bid bond is to "protect the United States in case the bid is withdrawn or the contractor fails to execute the contractual documents or fails to give a performance bond." *Peerless Ins. Co. v. United States*, 674 F.Supp. 1202, 1203 (E.D.Va.1987) (quoting *United States v. Maryland Casualty Co.*, 213 F.Supp. 800, 803–04 (E.D.N.Y.1963)); *see* 41 C.F.R. § 1–10.102 (1981). When the plaintiffs executed the bid bond, they obligated themselves to pay the Government up to $739,-109.60 in the event Marvin's bid was accepted, but the contractor failed to execute the contract documents. The bond is signed by plaintiffs and by Marvin's president. The United States is not a signatory to the bond and no obligations of the United States are recited. In short, the bid bond obligates the sureties but not the Government.

In *Balboa Ins. Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985), the Court of Appeals for the Federal Circuit referred to the relationship between the Government, the contractor, and the surety on a performance or payment bond as a "tripartite" one. Even though the bond only recites obligations running from the surety and contractor, the risk assumptions in the case of either performance or payment bonds make no sense without an obligee (the Government). The arrangement between the parties in the case of a bid bond can be characterized in the same way. The contractor pays a premium to the surety and the surety agrees to pay the Government in the event the conditions on the bond are not met. However, the fact that this tripartite relationship exists does not necessarily mean that the United States has assumed obligations running to the sureties, or that privity of contract is present so as to permit the sureties to sue the Government. There is certainly nothing in the bid bond or the circumstances of its execution that constitute an express assumption of obligations by the United States. The Federal Circuit has never recognized any contractual or equitable obligations on the part of the Government arising out of bid bonds.

█ In the context of performance and payment bonds, at least two theories of recovery are available to sureties which are relevant to this action. First, it is well established that a surety who takes over a project for a defaulted contractor can seek to recover its cost from the remaining contract funds. *See Carchia v. United States*, 202 Ct.Cl. 723, 735, 485 F.2d 622, 628–29 (1973); *Universal Surety Co. v. United States*, 10 Cl.Ct. 794, 799 (1986). Second, the Federal Circuit has applied the doctrine of equitable subrogation, even in the absence of a takeover. Under that approach, the surety can attempt to recover progress payments or the final payment

when it notifies the Government that its principal is in default, or is about to go into default. The United States in effect becomes a stakeholder for remaining contract proceeds. *Balboa,* 775 F.2d at 1162. The decisions of this court have emphasized, however, that in the absence of a takeover agreement or in the event that equitable subrogation is not applicable, no privity exists to support a claim by a surety against the Government. *Washington Int'l Ins. Co. v. United States,* 16 Cl.Ct. 663 (1989); *Fidelity & Deposit Co. of Maryland v. United States,* 14 Cl.Ct. 421, 422–23 (1988); *Universal Surety Co. v. United States,* 10 Cl.Ct. 794, 799–800 (1986).

■ Plaintiffs do not rely in Count I on either the theory of equitable subrogation or the subsequent takeover agreement. And they are aware that there is no precedent in this circuit giving a cause of action to a bid bond surety in these circumstances. Nevertheless, they ask the court to hold that upon execution and acceptance of Marvin's bid, the Government owed plaintiffs a contractual duty to deal fairly and honestly with them. The Government allegedly breached this duty when it failed to notify them that it had information drawing the bid into question, and that it had offered Marvin the opportunity to withdraw its bid. Plaintiffs argue that had they known about Marvin's incorrect bid and the ensuing option to withdraw that bid without penalty, they never would have served as payment and performance bond sureties for Marvin, and consequently they would not have been liable for performing the contract in excess of the contract price after Marvin's default.

The simple answer to plaintiffs' contentions is that there was no underlying assumption by the Government of a contractual obligation into which a covenant of good faith and fair dealing could be implied. There was no express oral or written agreement since there is no allegation of contact between the Government representatives and plaintiffs prior to submission of Marvin's bid. Nor are there circumstances alleged here or evident to the court

that would permit a finding of an implied contract, much less one in which the United States assumed an obligation to inform the sureties of problems with Marvin's bid. An implied-in-fact contract requires the same elements of mutual intent to contract, lack of ambiguity in offer and acceptance, consideration, and authority to contract on the part of the Government representative, *Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 750, 508 F.2d 817, 822 (1974); *Marvel Engineering,* 14 Cl.Ct. at 618. Plaintiffs have not demonstrated any of these elements. They do not even allege that there were negotiations between the parties or representations made directly to these sureties or prospective sureties in general.

Despite the lack of direct support for their position, plaintiffs draw on two lines of authority they believe are applicable. They first point to those cases which hold that the Government has a duty under certain circumstances to disclose its superior knowledge to bidders or to performing contractors. For example, they point to *Petrochem Services, Inc. v. United States,* 837 F.2d 1076 (Fed.Cir.1988), where the Government was held to have a duty to disclose its superior knowledge about the extent of an oil spill to a contractor who had undertaken to clean it up. The court summarized the law as imposing a duty where:

(1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

*Petrochem Services,* 837 F.2d at 1079.

The concept of superior knowledge is a poor fit, however, in the circumstance of a bid bond. The theory, at least in part, is drawn from the implied obligation in any contract that the parties will deal with each other fairly and honestly, will not engage

in misrepresentation, and will not hinder contract performance. *See Petrofsky v. United States*, 222 Ct.Cl. 450, 454, 616 F.2d 494, 497, *cert. denied*, 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981); *Helene Curtis Industries, Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774 (1963); *Bateson–Stolte, Inc. v. United States*, 145 Ct.Cl. 387, 172 F.Supp. 454 (1959). Such an obligation, however, assumes either the existence of an underlying contract for goods or services, or that such a contract is about to be executed based on the false information. The Government's obligation is to an entity it has already been dealing with, or to which it has made direct representations. In other words, there is privity between the parties.

To imply the same obligation to a surety requires a great deal more fictionalizing. In a bidding context, there may be a number of sureties, each supporting separate bidders. Even though each surety assumes obligations to the Government, the Government has in all probability not had contact with any of the sureties. It would significantly complicate the normal process of obtaining bids if the Government had to be concerned not only with routine disclosure to potential contractors, but also with the knowledge of their sureties, particularly if the information had nothing to do with the project at issue but instead related solely to an individual contractor's ability to perform, about which the surety is presumably informed. The scenario is simply too far removed from the circumstance of a direct two-party contractual relationship in which the Government's role in negotiating and performing the contract is focused in terms of the identity of parties and the need for information.

Plaintiffs also rely on a line of authority developed in the context of private commercial litigation and reflected in the Restatement of the Law of Security:

§ 124. Non–Disclosure By Creditor.

(1) Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

(2) Where, during the existence of the suretyship relation, the creditor discovers facts unknown to the surety which would give the surety the privilege of terminating his obligation to the creditor as to liability for subsequent defaults, and the creditor has reason to believe these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety without a violation of a confidential duty, the creditor has a duty to notify the surety, and breach of this duty is a defense to the surety except in respect of his liability for defaults which have occurred before such disclosure should have been made.

Restatement of the Law of Security § 124 (1941). The comments in the Restatement make clear that this section seeks to identify a species of fraud. It is based on the rule of contract law that fraud constitutes a defense. *Id.* comment a.[2] To like effect

---

**2.** Plaintiff also cites specific cases. *Sumitomo Bank of California v. Iwasaki*, 70 Cal.2d 81, 73 Cal.Rptr. 564, 447 P.2d 956 (1968), concerned a bank's duty of disclosure to a surety who offered to continue guaranteeing the loans of a debtor. The Supreme Court of California held that the bank in that case had a duty to communicate to the guarantor those facts which it had reason to believe were unknown to the guarantor and which materially increased the guarantor's risk beyond that which it intended to assume. *Id.*, 73 Cal.Rptr. at 565, 447 P.2d at 957. The court further held that, whereas a creditor dealing with a stranger might reasonably assume the guarantor would place more reliance

on the debtor's disclosures, six years of prior dealings between the creditor bank and the guarantor supported a greater duty of disclosure on the part of the bank. *Id.* at 566, 447 P.2d at 958. There is no comparable course of dealing here.

Plaintiffs also rely on *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 646 F.2d 1064, 1072–73 (5th Cir.1981), as support for the proposition that a creditor has a duty to disclose facts within its knowledge that are unknown to the surety and that materially increase the surety's risk. The information withheld in *St. Paul* would have been available to the surety only

is plaintiffs' reference to A. Stearns, *Law of Suretyship* § 7.15, at 218 (5th ed. 1951).

■ There are a number of difficulties with plaintiffs' reliance on this line of authority. At the outset, the court finds these materials inapplicable as a matter of law. It is fundamental to jurisprudence in this court that federal common law controls; not state law or general common law. *Boyle v. United Technologies,* — U.S. ——, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988); *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 592–94, 93 S.Ct. 2389, 2396–98, 37 L.Ed.2d 187 (1973). An important reason is that state law and general common law regarding relationships between private parties is not forced to give regard to the principle of sovereign immunity. Any waiver of sovereign immunity, of course, has to be strictly construed. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Absent an express waiver of sovereign immunity, suit cannot be brought against the Government. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).

■ The second difficulty for plaintiff is that the Restatement merely recognizes a defense available to the surety *to an action on the bond* for payment of the penal sum. The losses the sureties complain of in Count I, however, were not the result of their being called on to satisfy their bid bond obligations. The sureties' obligations on those bonds were satisfied when Marvin executed the contract documents and provided performance and payment bonds (executed by plaintiffs). Plaintiffs never had to pay the penalty sum on the bid bond.[3]

Even assuming that the principle set out in the Restatement applies here, it is important to note two limitations on its successful use. First, the information has to be unknown to the surety and the "creditor" has to have reason to know the facts are unknown to the surety. Second, the sureties themselves must exercise reasonable diligence to become knowledgeable about the circumstances of a transaction and the principal's financial condition; if there are suspicious circumstances, the sureties have a duty to inquire. As a corollary, the creditor is generally not required to voluntarily communicate to the surety matters concerning the financial responsibility of the principal, unless the surety makes specific inquiry regarding the point. A. Stearns, *Law of Suretyship* § 7.15, at 220. This is brought out in *St. Paul Fire & Marine Ins.,* relied upon by plaintiffs. Citing *Magee v. Manhattan Life Ins. Co.,* 92 U.S. 93, 98–99, 23 L.Ed. 699 (1875), *St. Paul* makes clear the duty of a surety to seek information itself:

> If a surety fails to seek important information that is *available to him,* he cannot, *in the absence of fraud,* assert as a defense ignorance of facts which he should have known and considered prior to the execution of the contract. The law does not favor the indifferent, unseeing surety who fails to help himself. Unless the creditor is aware that the surety is mistaken as to the duty, or there is a request for information by the surety, ... a creditor cannot be charged with withholding information that could have been discovered by the surety.

*St. Paul Fire & Marine Ins.,* 646 F.2d at 1072–73 (emphasis in original).

In the present case, plaintiffs did not exercise reasonable diligence; if they had, they would have discovered the same mistake in Marvin's bid that prompted the

after extensive examination of industry practices, *id.* at 1073–74. The creditor was also held to have known about fraudulent practices of the contractor, but failed to disclose them to the surety, *id.* at 1073.

3. In paragraph 21 of the amended complaint, plaintiffs allege that "defendant intentionally concealed and suppressed such information from plaintiffs in order to induce plaintiffs to execute and deliver performance and payments." The court has carefully reviewed the

stipulated record and finds not a scintilla of evidence to support that allegation. In any event, plaintiffs' attempt to use the restatement line of analysis as a basis for an affirmative monetary claim must also fail to the extent it is based on an allegation of fraud. Such a claim would be barred by the Federal Tort Claims Act. 28 U.S.C. § 2680(h) (1983); *see Somali Dev. Bank v. United States,* 205 Ct.Cl. at 750, 508 F.2d at 822.

Government's and Triax's concern. It is critical to note in this connection that the relevant "missing" data here was not the offer to Marvin to withdraw its bid, or that another bidder had opined that Marvin would not be able to do the work. The relevant fact was that Marvin had miscalculated its bid. That, however, is a mistake that plaintiffs had, in effect, undertaken to guarantee. It was the relative amount of Marvin's bid as compared to other bids—information which was equally accessible to plaintiffs—which prompted the Government, as well as the next lowest bidder, to initially question Marvin's bid. There is no evidence that the Government suspected that the sureties neither knew nor had reason to obtain information about the error in Marvin's relatively low bid; rather, they could reasonably expect that sureties would investigate the nature of the obligation they undertook. Marvin's bidding error in turn is attributable solely to itself or its subcontractors, and cannot be attributed to any error or misinformation on the part of the Government.

The court rules that the Government had no duty to relay the Triax comment to the plaintiffs. The statement was not a fact in any meaningful sense. It was a conditional assessment. Triax did not say there was some technical reason Marvin could not perform. Instead, it merely wrote that it would be "virtually impossible" for Marvin to make a reasonable profit. Presumably Triax thought it possible that Marvin could earn a very small profit, or no profit at all.

The court holds that the United States had no duty to pass along Triax's gratuitous speculation, particularly when it was based on the disparity in bids—information to which plaintiffs had full access. Nor did the Government owe the sureties the duty to notify them of Marvin's opportunity to withdraw its bid. Marvin chose not to withdraw its bid, and Ransom and Nesen have not asserted any right to unilaterally withdraw their bid bond in the event Marvin elected to proceed.

Recognizing that they were never called on to perform their duties under the bid bond, plaintiffs contend that the real harm came when the information in question was not provided prior to their assumption of the performance and payment bonds. That is, the Government should have foreseen the likelihood of plaintiffs becoming the performance and payment sureties, and that by not warning plaintiffs of Government's concerns about Marvin's ability to perform, the Government cannot now insist on enforcing the latter bonds. That analysis must be rejected. There is no precedent for imposing on the Government a duty to guess who a contractor will use as a performance and payment surety, much less a duty to pass along what, in substance, is an evaluation of public information.[4]

Finally, plaintiffs' least compelling argument is that, as inexperienced sureties, they were owed a higher duty by the Government than might otherwise be the case. Inasmuch as plaintiffs assumed their role as sureties in a profit-making venture,

---

**4.** Plaintiffs also cite *Peerless Ins. Co. v. United States,* 674 F.Supp. 1202 (E.D.Va.1987). That action involved a bid bond. There, however, the plaintiff was called upon to fulfill its obligations under the bond. Unlike the circumstances here, defendant in that case refused to enter a contract with the principal since the contractor was unable to get sureties for its performance and payment bonds. Defendant sought to enforce the bid bond, and the surety asserted in defense that the Government breached a duty to mitigate damages by not acting more promptly in securing a new contractor. Three aspects of *Peerless* prevent its application here. First, the court did not hold that a duty to mitigate exists. It merely stated that if a duty exists, it was not breached because the Government acted reasonably. Second, the duty discussed in *Peerless* arose in connection with the

defendant's attempt to enforce the *bid* bond. The parties' respective rights and obligations are relatively focused in that circumstance. The Government should be aware that the sureties' risk is directly tied to whether a new contractor can be obtained at the old price. The duty envisioned by plaintiffs here, however, transcends the bid bond by linking the sureties' obligations on the bid bond with their assumption of the payment and performance bonds. That is at lease one step removed from *Peerless.* Finally, the district court's comments concerning the similarity of bid bonds with performance and payment bonds relate to an assumed duty to mitigate. This court does not read those comments as suggesting that the three types of bonds are necessarily similar in all other respects.

it is not the Government's responsibility to look after their interests for them. Sureties are expected to insure the Government; not vice-versa. In sum, the court holds that the facts asserted in Count I did not give rise to a contractual relationship. The court has considered plaintiffs' other contentions and finds that they do not permit recovery by plaintiffs.

*Count II*

■ In this count, plaintiffs allege that Marvin's performance on the contract was so poor that a point arose at which the Government should have stopped making progress payments even in the absence of notice from the plaintiffs. They believe the facts show that moment to be before June 8, 1981, the date of the last progress payment. In their motion for partial summary judgment, plaintiffs ask that the court recognize that such an obligation on the part of the Government can arise without notice, although they believe the precise circumstances are contested and thus preclude complete adjudication on summary judgment.

In *Balboa Insurance Co.*, 775 F.2d 1158, the court recognized limited circumstances in which a non-completing performance or payment bond surety can recover for breach of an implied agreement by the Government to deal fairly and in good faith with the surety. The surety in *Balboa* informed the contracting officer that the contractor was in financial difficulty and would not be able to complete the contract. Despite requests by the surety that no further progress payments be made, the Government continued to make payments, and the surety sued to recover funds that had been disbursed after it asked that payment be stopped. The court in *Balboa* held that the surety had standing to sue because "a suretyship is a ... three-party agreement and ... a surety, as bondholder, is as much a party to the government contract as the contractor." *Id.* at 1160.

Plaintiffs contend that *Balboa* and the cases decided after it permit recovery even in circumstances in which there is no notice to the Government of impending default. They argue that from the moment the performance and payment bonds are executed, the Government was under a duty to exercise reasonable care to prevent loss or damage to plaintiffs in the administration and supervision of the contract. They contend that an obligation to divert progress payments arose in this case when the Government knew or should have known of the impending default of Marvin. Plaintiffs contend that Marvin's performance was so poor that no notice from plaintiffs was necessary to obligate the defendant to divert payments to the sureties. Because there is a disagreement between the parties on the issue of how much work had been completed at the time of the last progress payment, plaintiffs contend that summary judgment is precluded. The court disagrees for two independent reasons.

First, the court rules as a matter of law that before any obligation arises to withhold or divert funds, the Government must be notified that the sureties believe the contractor is in default and cannot complete the contract. Because there was no notice to the Government in this case before the last progress payment, no obligation arose on the part of the Government to exercise due care on behalf of the sureties in making payments to the contractor. This rule is clearly required by the circumstances and language of *Balboa*. At numerous places the court states that a predicate to the existence of a duty is notice from the surety. For example, *"[w]hen a surety has informed the government* that the contractor is in default, the government has an obligation to take reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job." *Id.* at 1164 (quoting *Fireman's Fund Ins. Co. v. United States*, 362 F.Supp. 842, 848 (D.Kan.1973) (emphasis added). Also, "we are satisfied that the United States becomes a stakeholder with a duty of acting with reasoned discretion *when a Miller Act surety alleges that the contractor has breached the contract* by defaulting under one of the bonds." *Id.* at 1162 (emphasis added).

It is only after such notice is established that it becomes necessary to determine whether the Government acted reasonably in distributing funds. Even in enumerating the eight factors to be considered in assessing reasonableness, the court repeated the predicate of notice:

(1) Attempts by the Government, *after notification by the surety,* to determine that the contractor had the capacity and intent to complete the job.

(2) Percentage of contract performance completed *at the time of notification* by the surety.

(3) Efforts of the Government to determine the progress made on the contract *after notice by the surety.*

(4) Whether the contract was subsequently completed by the contractor (not conclusive, but relevant to show the reasonableness of the contracting officer's determination of the progress on the project).

(5) Whether the payments to the contractor subsequently reached the subcontractors and materialmen (this goes to the equitable obligation of the Government to subcontractors and others to see that they will be paid; also, because the surety is liable to the subcontractors, any money that reaches them furthers the objectives of the surety as well as those of the Government).

(6) Whether the Government contracting agency had notice of problems with the contractor's performance *previous to the surety's notification* of default to the Government.

(7) Whether the Government's action violates one of its own statutes or regulations.

(8) Evidence that the contract could or could not be completed as quickly or cheaply by a successful contractor.

*Id.* at 1164–65 (citations omitted) (emphasis added).

Other decisions support this conclusion. In *United States Fidelity & Guar. Co. v.*

*United States,* 230 Ct.Cl. 355, 676 F.2d 622 (1982), the court explored the reasonableness of the Government's failure to divert progress payments to the surety, but only after cataloging a number of steps taken by the surety to demand such diversion on the ground that the contractor was in default. To similar effect is *Argonaut Ins. Co. v. United States,* 193 Ct.Cl. 483, 434 F.2d 1362 (1970). The surety in that case had made specific requests that the Government make all future payments to it, alleging that the contractor should be terminated for default. *See also United States Fidelity & Guar. Co. v. United States,* 201 Ct.Cl. 1, 7–8, 475 F.2d 1377, 1380 (1973) ("when the United States is in the position of a stakeholder, it is not free simply to pay the contractor *when the surety has given adequate notice* of other competing claims to the fund" (emphasis added)); *Great American Ins. Co. v. United States,* 203 Ct.Cl. 592, 599, 492 F.2d 821, 825 (1974) ("the Government will be liable to the surety if, *after due notification* of the claims of laborers and materialmen, it wrongfully pays the final contract payments to the contractor or his assignee" (emphasis added)); *Washington International Ins. Co. v. United States,* 16 Cl.Ct. 663, 666 (1989) ("the Government, with adequate notice, must retain the funds"); *United States Fidelity & Guar. v. United States,* 16 Cl.Ct. 541, 544 (1989) ("after due notification"); *Reliance Ins. Co. v. United States,* 15 Cl.Ct. 62, 66 (1988) (surety's "equity" interest arose at the time it notified the Government of contractor's failure to pay subcontractors, and it requested withholding of payment); *Universal Surety,* 10 Cl.Ct. at 798 ("so long as the surety notified the Government").[5]

As defendant correctly points out in its brief, notice is essential because without it, the Government is not a stakeholder with respect to the monies it holds. This is clear from *Balboa* where the court states:

---

**5.** Plaintiffs point to the decision of this court in *United Pacific Ins. Co. v. United States,* 16 Cl.Ct. 555 (1989) as expressing a contrary view. Although the precise issue here (whether notice is necessary) does not appear to have been raised

there, a fair reading of the decision is that it supports plaintiffs' position. To the extent *United Pacific* stands for the proposition that notice from the surety is not necessary, the court respectfully disagrees.

In *Great American Insurance Co. v. United States*, 492 F.2d 821 (Ct.Cl.1974), the Court of Claims stated that

> [W]hen plaintiff ... notified defendant of the unpaid claims of laborers and materialmen and asserted a claim to the unpaid contract balance, the defendant still held [as yet unpaid funds]. At that time the Government asserted no claim to the [funds] so that the Government held that amount as a stakeholder with full knowledge that the surety and the assignee claimed a right to the money.

We agree with the conclusion of the Court of Claims that, upon notification by the surety of the unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default.

*Balboa*, 775 F.2d at 1161–62.

It is significant in this connection that the Government had no legal obligation to suspend a progress payment merely on demand of the surety. *United States Fidelity & Guar.*, 230 Ct.Cl. at 364, 676 F.2d at 628; *United States Fidelity & Guar.*, 201 Ct.Cl. at 14, 475 F.2d at 1384. In fact, the Government could thereby expose itself to liability. *See Newark Ins. Co. v. United States*, 144 Ct.Cl. 655, 658, 169 F.Supp. 955, 957 (1959). Consequently, the contracting officer, during performance of a contract, is given broad discretion; the surety's burden of proof to show the decision in question was arbitrary is a heavy one. *United States Fidelity & Guar.*, 230 Ct.Cl. at 365, 676 F.2d at 628; *Royal Indemnity Co. v. United States*, 208 Ct.Cl. 809, 529 F.2d 1312 (1976).

■ The court thus rules as a matter of law that notice is required before the United States becomes obligated to a surety to exercise reasonable discretion in administering contract funds. It further holds that there was no other independent contractual duty to protect the sureties' interests. Since Ransom and Nesen did not notify the Government of Marvin's impending default until after the last progress payment, they are not entitled to recover. An analysis of the eight reasonableness factors under *Balboa* is therefore unnecessary.[6]

Even assuming that the court were called on to evaluate the reasonableness of the Government's conduct in making the challenged progress payments, the decision would be upheld. As was pointed out in *Royal Indemnity Co.*, 208 Ct.Cl. at 823, 529 F.2d at 1320, the "plaintiff has an unusually heavy burden of proof in showing that the determination made ... was arbitrary and capricious." The court has reviewed the evidence, and construing it most favorably to plaintiffs, and assuming only ten percent of the work was actually completed,[7] the contracting officer's conduct prior to June 9 was not an abuse of discretion.

---

**6.** Plaintiff also cites the Government's failure to notify plaintiffs of Marvin's problems in performing the contract as a violation of 48 C.F.R. § 228.106–70. The earlier version of that section, applicable here, is the same:

> When a contractor is performing his contract in such a manner as to lead to default, timely notification to the surety may result in action by the surety that will avoid default. Therefore, on all such contracts, the surety shall be promptly notified of any failure by the contractor to perform (see 8–602.4(i) and 18–618.-3).

32 C.F.R. § 10–112(b) (1981). The requirements of this regulation were satisfied when the Government sent a copy of the show cause notice to the sureties. More importantly, this section is clearly intended to protect the interests of the Government. The two cross-references in the regulation refer to options in the event the contractor appears headed to default. 32 C.F.R. § 8–602.4, "Procedures in Lieu of Termination for Default," states that the following procedure is *available* to the contracting officer: "(i) permit the contractor, his surety, or his guarantor to continue performance...." The other reference is to 32 C.F.R. § 18–618.3, "Preliminary Notice to Surety," which states that the contracting officer *"may"* give written notification that default is imminent to the surety.

**7.** Although the court assumes plaintiffs' view on this sole controverted issue, it is uncontroverted that in addition to the completed work, Marvin had been paid a substantial amount for materials purchased and on site.

## CONCLUSION

For the foregoing reasons, plaintiffs' cross-motion for summary judgment as to Count I and for partial summary judgment as to Count II is denied. Defendant is granted summary judgment as to Counts I and II. The clerk is directed to dismiss the complaint.