**William A. RANSOM and Robert D. Nesen, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 89–1651.**

United States Court of Appeals, Federal Circuit.

April 5, 1990.

Richard M. Norman, Muegenburg, Norman & Dowler, Ventura, Cal., argued, for plaintiffs-appellants. With him on the brief, was Diane G. Hancock.

Cheryl S. Rome, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued, for defendant-appellee. With her on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Washington, D.C., Director. Also on the brief, was Major Scott Bagley, HQUSAF–JACN, The Pentagon, Washington, D.C., of counsel.

Before RICH and MICHEL, Circuit Judges, and SKELTON, Senior Circuit Judge.

MICHEL, Circuit Judge.

William A. Ransom and Robert D. Nesen (Ransom) appeal from the United States Claims Court's decision granting summary judgment to the United States as to both of Ransom's breach of contract claims under the Tucker Act and dismissing the complaint. *Ransom v. United States*, 17 Cl.Ct. 263 (1989). Because we hold that neither an express nor implied-in-fact contract arose at any time between the government and Ransom, and that the government consequently owed no obligations to Ransom that it could have breached, we affirm.

## BACKGROUND

Ransom contracted to serve as surety on a bid bond and on a payment and performance bond submitted to the government by A. Marvin Company Diversified, Inc. (Marvin), the lowest bidder on a contract to rehabilitate housing units located at Edwards Air Force Base, California. Marvin's bid was approximately $1.7 million lower than the government's estimate of the performance cost plus profit. *See id.* at 264. Consequently, the government requested, by telephone, that Marvin confirm the bid price. Marvin did so by letter to the procuring contract officer (CO). The CO then made a written request for either confirmation of the bid or notification if Marvin made a mistake in the bid. Marvin reported an error of $496,324. Two weeks later Marvin informed the government that the error was only $396,440, and requested the bid be increased by that amount. *Id.* at 264–65. The Judge Advocate concluded that clear and convincing evidence supported a determination of bona fide error. However, he ruled that clear and convincing evidence of the intended amount of the bid was lacking. Accordingly, Marvin was given an opportunity to withdraw its bid, but was not allowed to amend it. Marvin responded that it would perform the contract for the originally submitted bid price. Ransom did not receive any correspondence concerning the bid error. *Id.* at 265.

Marvin was awarded the contract on September 25, 1980. *Id.* Marvin received progress payments through June 8, 1981. On July 24, 1981, Ransom was notified by the government that it was concerned about default by Marvin. *See id.* at 266. Marvin's right to perform under the contract was terminated September 8, 1981, and the contract was terminated for default on October 26, 1981. Ransom executed a takeover agreement to complete the contract. *Id.*

Ransom submitted a claim for money damages for its costs in completing the contract which the CO denied. *Id.* The basis for the claim was that the surety relationship between Ransom and Marvin automatically gave rise to a contract between Ransom and the government. That contract, Ransom asserts, inherently included covenants of good faith and fair dealing that Ransom alleges the government breached. Ransom asserts that the breach occurred when the government failed to notify Ransom of Marvin's option to withdraw its bid. Additionally, Ransom argues that the government breached its duty to deal fairly and in good faith with Ransom when it made its last progress payment to Marvin in June 1981 because it

knew or should have been aware that Marvin was already in default at that time.

Ransom filed a complaint in the United States Claims Court on May 7, 1984. That complaint was dismissed on the ground that Ransom had failed to certify the claim. *See id.* at 266 & n. 1. On appeal, this court vacated the dismissal and remanded the case. *Ransom v. United States*, 838 F.2d 1222 (Fed.Cir.1988). Thereafter, both Ransom and the government filed motions for summary judgment.[1] The Claims Court granted summary judgment to the government concluding that no contract existed between Ransom and the government, and thus no duties were owed by it to Ransom. *Ransom*, 17 Cl.Ct. at 264, 272. Ransom appeals here under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), and the Contract Disputes Act, 41 U.S.C. § 609 (1982), invoking our appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (1982).

## OPINION

### I.

In reviewing a grant of summary judgment, this court must determine whether the strict standard set forth in Rule 56(c) of the Rules of the United States Claims Court was satisfied. *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987). The issue presented here concerns whether a contract existed, a mixed question of law and fact. *See generally S. Williston*, 4 *Williston on Contracts* § 616, at 648–49 (W. Jaeger 3d ed. 1961). We review the trial court's legal conclusions de novo. In the instant case both parties concede there are no genuine issues of material fact and thus we need only decide the same question of the law of contract formation considered by the trial court on summary judgment.

### II.

■ To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract. *Silverman v. United States*, 679 F.2d 865, 870, 230 Ct.Cl. 701 (1982); *cf.* 28 U.S.C. § 1491(a)(1) (1982). Ransom asserts that an express contract existed among the government, Marvin, and Ransom, because of the written contract the government and Marvin executed, creating implied obligations to Ransom that the government deal fairly and in good faith with Ransom. To support this view, Ransom argues that an express contract arose from the government's accepting the bonds that were executed by Ransom but given to the government by Marvin. We conclude that on these facts no express contract was intended by the parties to this suit, and none existed. No authorized representative of the government ever said anything that could be construed as intending to obligate the government to the surety, Ransom. No government representative ever signed the bonds or was asked to. Nor did the government sign any other document with Ransom. Finally, there is no language in the bonds themselves that even purports that the government is to be obligated to Ransom.

■ In the alternative, Ransom argues that an implied-in-fact contract arose between the government and Ransom. Although the legal consequences of express and implied-in-fact contracts are the same, an implied-in-fact contract is inferred from the parties' conduct. *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923). Ransom argues that the above noted events involving Ransom, in the context that the government required that Marvin obtain bonds, necessarily imply a contract between the government and Ransom. We are unpersuaded. That the government requires *contractors* to provide such bonds at most evidences an implied contract between the government and the contrac-

---

1. The trial court converted the government's motion to dismiss one count to a motion for summary judgment. Both parties sought summary judgment on the only other count. *See Ransom*, 17 Cl.Ct. at 264, 266–67.

tors.[2] In this case, the requirement placed on Marvin cannot be construed as an "objective manifestation" that the government intended to undertake obligations to Ransom.

Ransom cites *Balboa Insurance Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir.1985) as holding that a government contract requiring a bond creates a three-party contract in which all three parties—the government, the contractor, and the surety—have rights and obligations. This court said:

> In contrast to a subcontractor, which has no obligations running directly to or from the Government, (and therefore possesses no enforceable rights against the United States), a surety, as bondholder, is as much a party to the Government contract as the contractor. If the *surety* fails to perform, the Government can sue it on the bonds.

*Id.* (citations omitted). Nevertheless, *Balboa* did not hold a surety has contractual rights against the government just because the government has contracted with the principal of the suretyship, *i.e.*, the contractor. In *Balboa*, this court merely held that the government becomes a "stakeholder" for remaining contract proceeds when a payment and performance bond surety notifies the government that the surety's interest is in jeopardy because of default by the contractor. *Id.* at 1160–63. This holding was based upon the reasoning that once the surety notified the government of the contractor's default, the surety could assert the equitable doctrine of subrogation. *Id.* No such notice by the surety is alleged here.

Although one of our predecessor courts, the United States Court of Claims, as well as this court have recognized subrogation as entitling sureties to succeed to the contractual rights of the contractor against the government,[3] Ransom has not asserted this doctrine as a basis for its cause of action. *Ransom*, 17 Cl.Ct. at 268. Moreover, in *Balboa* this court carefully qualified its statement about surety's rights in relation to government contracts. We stated that "it is conceivable that *under certain circumstances* a surety could assert rights against the Government" based on contract theory. *Balboa*, 775 F.2d at 1160 (emphasis added). Although the government *could* be contractually bound to a surety if it manifested such an intent, as alluded to in *Balboa*, that did not occur in this case and Ransom has not cited any act or statement as doing so.

Accordingly, we conclude that no contract existed between Ransom and the government, either based on the bidding process or the performance contract between Marvin and the government. Consequently, in this case, the government did not owe the duties alleged by Ransom. Hence, Ransom cannot be entitled to damages for the government's alleged breach of such contractual duties. The grant of summary judgment and the dismissal of the complaint are therefore

AFFIRMED.

**2.** The government attempts to distinguish Ransom's claim based on the bid bond relationship from the claim based on the payment and performance bond relationship. The government argues that not even Marvin could lay claim to the underlying contract funds because no contract had yet been formed. We disagree, however, because during the bidding process, an implied-in-fact contract did exist between Marvin and the government ensuring that the government deal fairly and in good faith in considering Marvin's bid. *See CACI, Inc.—Federal v. United States*, 719 F.2d 1567, 1573 (Fed. Cir.1983). Although two separate contractual relationships existed, bidding and performance, we interpret Ransom's argument to be that both those relationships resulted in three-party contracts. Consequently, our analysis does not delineate between the two contractual relationships, but merely seeks to determine whether in either transaction the government manifested intent to contract with Ransom.

**3.** *See, e.g., United States Fidelity & Guaranty Co. v. United States*, 475 F.2d 1377, 1382, 201 Ct.Cl. 1 (1973); *Balboa*, 775 F.2d at 1161; *see also Prairie State Bank v. United States*, 164 U.S. 227, 231, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896).