NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**TOMMY WESLEY SCOTT,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

_____

2023-2102

_____

Appeal from the United States Court of Federal Claims in No. 1:22-cv-01603-SSS, Judge Stephen S. Schwartz.

_____

Decided:  April 29, 2024

_____

TOMMY WESLEY SCOTT, Helena, OK, pro se.

ANDREW MARSHALL BERNIE, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant-appellee.  Also represented by TODD KIM.

_____

Before DYK, BRYSON, and STOLL, *Circuit Judges*.

BRYSON, *Circuit Judge*.

Appellant Tommy Wesley Scott was convicted of first-degree murder and is serving two consecutive life sentences in an Oklahoma state prison. He contends that he is a member of the Muscogee (Creek) Nation and that the crimes of which he was convicted were committed on the Cherokee Reservation. Because the Major Crimes Act, 18 U.S.C. §1153(a), grants the United States exclusive jurisdiction over certain crimes, including murder, committed by Indians on Indian reservations, he argues that the State of Oklahoma improperly exercised criminal jurisdiction over him.

Mr. Scott filed an action in the Court of Federal Claims ("the Claims Court") seeking relief from the United States for his improper incarceration in the form of a monetary award. The Claims Court dismissed his complaint for lack of jurisdiction. We affirm.

I

Mr. Scott's conviction was based on a plea of guilty that he entered in 1993. JA 11. He did not seek to withdraw his plea or appeal his conviction. In 2020, he filed an application for post-conviction relief in Oklahoma state court. He contended that under the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), the Oklahoma state courts lacked jurisdiction over him because he is an Indian and his crime occurred in "Indian Country." Under *McGirt*, he argued, the United States had exclusive jurisdiction over his offense, and his conviction therefore had to be vacated.

The state court denied his request for relief. Citing Tenth Circuit law, the court held that the *McGirt* case should not be given retroactive application to void a final state conviction, such as Mr. Scott's. App. 11-16. Mr. Scott's appeal from that decision was dismissed as untimely. App. 17–18.

Mr. Scott then sought habeas corpus relief from a federal district court in the Northern District of Oklahoma. That court dismissed the petition on the ground that it was barred by the one-year statute of limitations for federal habeas corpus petitions in 28 U.S.C. § 2244(d)(1). App. 20–21.

Shortly thereafter, Mr. Scott filed this action in the Claims Court. In his complaint, he based his claim for damages on two treaties entered into between the United States and the Muskogee (Creek) Nation, in 1832 and 1866. The 1832 treaty declared that no state or territory would have the right "to pass laws for the government of [the Creeks], but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them." Treaty with the Creeks, art. 14, 7 Stat. 366, 368 (1832). The 1866 treaty provided that the Creeks "agree to such legislation as Congress and the President of the United States may deem necessary for better administration of justice and the protection of the rights of person and property within the Indian Territory: provided, however, [that] said legislation shall not in any manner interfere with or annul their present tribal organization, rights, laws, privileges, and customs." Treaty with the Creek Indians, art. 10, 14 Stat. 785, 788 (1866).

Mr. Scott alleged in his complaint that because he is an Indian within the meaning of federal law and was convicted of crimes occurring within the boundaries of an Indian reservation, those two treaties, together with the Major Crimes Act, 18 U.S.C. § 1153, and the Indian Civil Rights Act, 25 U.S.C. §1301 *et seq.*, gave rise to a guarantee that he would not be subject to state criminal jurisdiction for his offenses.[1] Based on those provisions, he argued that

---

[1] The Major Crimes Act provides that certain crimes committed by Indians in Indian territory fall within

the federal government had the duty to remedy what he characterizes as his illegal detention by the Oklahoma Department of Corrections.

The Claims Court dismissed Mr. Scott's complaint for lack of jurisdiction. At the outset, the court characterized Mr. Scott's complaint as raising, in essence, a collateral attack on his state court conviction, since his request for monetary relief was based on his claim that his conviction was invalid. The Claims Court rejected that contention on the ground that the Court of Federal Claims is not authorized to grant habeas corpus relief or to review the judgments of state and federal courts with regard to the validity of state court convictions or the lawfulness of state court incarceration. App. 2.

The Claims Court further held that Mr. Scott's claim was not within the court's jurisdiction because it was not based on a "money-mandating" law, i.e., a law that can fairly be interpreted as mandating compensation by the federal government for damages sustained. *Id.* In particular, the court held that neither the Indian Civil Rights Act nor the Major Crimes Act is a money-mandating statute. *Id.* Although the court noted that it has jurisdiction to enforce the federal statute proving a monetary remedy for claims of unjust conviction, 28 U.S.C. § 2513(a)(1), that statute applies only to federal prisoners, and not to state prisoners such as Mr. Scott.

---

exclusive federal jurisdiction. The Indian Civil Rights Act acknowledges "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians," 25 U.S.C. § 1301(2), and contains various provisions affecting the allocation of criminal jurisdiction among state, federal, and tribal courts, *see id.* §§ 1301(f), 1303, 1304, 1321, 1323–26.

Finally, the court held that none of the treaty language on which Mr. Scott relies could be interpreted as requiring the federal government to provide monetary relief for unlawful state imprisonment.  App. 3.[2]

## II

The Claims Court is a court of limited jurisdiction.  The jurisdictional statute that applies to this case is the Tucker Act, 28 U.S.C. § 1491(a)(1), which grants the court jurisdiction over claims against the United States "founded either upon the Constitution, or an Act of Congress or regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."[3]  As the Claims Court observed, in order for the court to have jurisdiction under the Tucker Act, the plaintiff must be able to point to a "money-mandating" statute or other provision that requires the federal government to compensate the plaintiff for an injury other than one sounding in tort.

---

[2]     In the aftermath of the *McGirt* decision, the Claims Court has addressed several other claims from Oklahoma state inmates similar to Mr. Scott's and has resolved them all consistently with the Claims Court's ruling in this case. *See Cramer v. United States*, No. 23-37C, 2023 WL 3072541 (Ct. Fed. Cl. Apr. 25, 2023); *Greene v. United States*, No. 22-1064, 2023 WL 3072565 (Ct. Fed. Cl. Apr. 25, 2023); *Williamson v. United States*, No. 23-263C, 2023 WL 3032952 (Ct. Fed. Cl. Apr. 20, 2023); *Moore v. United States*, 163 Fed. Cl. 591 (2022).

[3]     In his complaint, Mr. Scott invoked the so-called Little Tucker Act, 28 U.S.C. § 1346, which provides the Claims Court with jurisdiction, concurrent with district courts, over certain damages actions, not sounding in tort, "not exceeding $10,000 in amount."  Because Mr. Scott has sought a much greater recovery than that, we treat his complaint as having invoked the Tucker Act instead.

*See United States v. Navajo Nation,* 556 US. 287, 290 (2009) (To establish jurisdiction, a plaintiff must identify a separate source of law that "can fairly be interpreted as mandating compensation by the Federal Government." (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)).

Mr. Scott's theory is that he is not pursuing a collateral attack on his conviction, but is alleging the breach of a "treaty/contract that [he] would not be subject to state law when a crime occurs on an Indian reservation." App. 5. Referring to four nineteenth century treaties with the Creek and Cherokee tribes,[4] he argues that "the treaties' provision can fairly be interpreted as 'money-mandating' when viewed through the lens of treaty interpretation." *Id.* at 5–6.

In effect, Mr. Scott contends that the treaty language on which he relies constitutes a promise by the United States that persons in Mr. Scott's position would not be subject to state prosecution, and that in the event of a breach of that promise, the federal government would be required to compensate the affected individuals for the resulting injury.

Mr. Scott's theory is unpersuasive. The Claims Court can assert jurisdiction over claims grounded in treaties between the United States and Indian nations, which are regarded as "essentially a contract between two sovereign nations." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979); *Tsosie v. United*

---

[4]    In addition to the two treaties he identified in his complaint, the Treaty with the Creeks, 7 Stat. 366 (1832), and the Treaty with the Creek Indians, 14 Stat. 785 (June 14, 1866), Mr. Scott in his brief on appeal has also referred to the Treaty with the Cherokees, 7 Stat. 478 (Dec. 29, 1835), and the Treaty with the Cherokee Indians, 14 Stat. 799 (July 19, 1866). App. 6.

*States*, 825 F.2d 393, 401 (Fed. Cir. 1987) (a treaty between the United States and Indian nations is "a species of contract."). Because breach of contract claims generally carry "a presumption that money damages are available," such claims normally fall within the reach of the Tucker Act. *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2014). But "[t]he government's consent to suit under the Tucker Act does not extend to every contract." *Id.* The contract "must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract." *Ransom v. United States,* 900 F.2d 242, 244 (Fed. Cir. 1990).

Those requirements are not satisfied here, for several reasons. First, the treaty provisions Mr. Scott cites in his complaint are not money-mandating. The language from article 10 of the 1866 treaty on which Mr. Scott relies, Treaty with the Creek Indians, 14 Stat. 785, 788 (June 14, 1866), permits Congress to enact legislation that it "may deem necessary for the better administration of justice and the protection of the rights of persons and property within the Indian territory," provided that the legislation "shall not in any manner interfere with or annul their present tribal organization, rights, laws, privileges and customs." Article 14 of the 1832 treaty on which he relies, Treaty with the Creeks, 7 Stat. 366, 368 (Mar. 24, 1832), provides that no state may "pass laws for the government of [the Creeks]." Nowhere do those treaties suggest that the federal government must pay damages to individuals claiming injury from the breach of those provisions of the treaties.[5]

---

[5] An example of a treaty provision that was held to give rise to an individual's claim for money damages is found in the "bad men" provision of the 1868 treaties with various tribes, including the Navajo Nation. That provision, which was held to be money-mandating in *Tsosie*, 825 F.2d at 401, stated that "[i]f bad men among the white, or among other

In his brief in this court, App. 6, Mr. Scott cites two other treaty provisions, article 5 of the Treaty with the Cherokees, 7 Stat. 478, 481 (Dec. 29, 1835), and articles 26 and 27 of the Treaty with the Cherokee Indians, 14 Stat. 799, 806 (July 19, 1866). In article 5 of the 1835 treaty, the United States promised that

> the lands ceded to the Cherokee Nation shall, in no future time, without their consent, be included, within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such person as have connected themselves with them.

7 Stat. at 481. Articles 26 and 27 of the 1866 treaty provided that the United States would protect the people of the Cherokee Nation from "all unauthorized citizens of the United States who may attempt to settle on their lands or reside in their territory," and that it would be "the duty of the United States Indian agent for the Cherokees to have such persons, not lawfully residing or sojourning therein, removed from the nation." 14 Stat. at 806.

Even when viewed in light of the principle that ambiguity or silence in agreements between the United States and a Native American tribe must be read to the tribe's benefit, *Hagen v. Utah*, 510 U.S. 399, 423–24 (1994), the treaty provisions on which Mr. Scott relies cannot be said

---

people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will . . . reimburse the injured persons for the loss sustained." Navajo Treaty of June 1, 1868, 15 Stat. 667–68.

to be money-mandating. The cited portions of the two treaties with the Cherokees guaranteed to the Cherokee Nation the right of self-government. But those passages do not provide for monetary compensation for a breach of the promises made by the United States. As such, the asserted breach of those provisions does not give rise to jurisdiction under the Tucker Act. *Navajo Nation*, 556 U.S. at 290.

Second, to the extent the treaty provisions at issue are deemed contractual in nature, they reflect agreements between the United States and the tribes. The agreements addressed the respective rights of sovereignty of the two contracting parties; they did not create contract-based rights in individuals, the breach of which could give rise to monetary remedies for those individual complainants. A treaty between the United States and an Indian Tribe "cannot provide a basis for the Tucker Act's contract-based jurisdiction" where the plaintiff "has not alleged that he was a party to the alleged contract or in privity with a party that was." *Landreth v. United States*, 797 F. App'x 521, 524 (Fed. Cir. 2020).

Mr. Scott has not identified any legal obligation owed by the United States to persons over whom Oklahoma has improperly exercised criminal jurisdiction. His incarceration is the result of state prosecution, not the product of any action by the federal government. His theory, as expressed in his complaint, is that "the United States had an obligation to protect [him] from state law." Not having done so, he argues, the federal government must "remedy the illegal detention" to which he and others similarly situated are subject, and to do so by the payment of money damages.

Nothing in the treaties on which Mr. Scott relies suggests that the federal government agreed to be held liable for damages in the event that a state sought to exercise criminal jurisdiction within Indian territories. *See Arizona v. Navajo Nation*, 599 U.S. 555, 564 (2023) (holding that a treaty which "set apart a reservation for the use and

occupation of the Navajo tribe" did not impose a "duty on the United States to take affirmative steps to secure water for the tribe."). In particular, there is nothing in the treaties to indicate that, if a state enacted legislation governing conduct in Indian territory, the federal government would be required to pay damages to individuals claiming injury from that action.

Third, the claim at issue in this case arises in the context of a criminal proceeding. As this court has noted, "breach of contract arising out of the criminal justice system does not ordinarily give rise to an action under the Tucker Act for damages." *Sanders v. United States*, 252 F.3d 1329, 1335 (Fed. Cir. 2001) (finding no jurisdiction over a claim seeking money damages for an alleged breach by a federal prosecutor of a stipulated agreement not to object to the plaintiff's continued release on bail); *Podlucky v. United States*, No. 2021-2226, 2022 WL 1791065, at *2 (Fed. Cir. June 2, 2022). As this court explained in *Sanders*, "enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not" the Claims Court. 252 F.3d at 1335.

The *Sanders* line of cases is a specific application of the general principle that "Tucker Act jurisdiction may . . . be lacking if relief for breach of contract could be entirely non-monetary." *Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015). While the treaties at issue in this case can be regarded as contractual in nature, they are contracts in which any remedies for breach would be non-monetary in nature and would not be the form of remedy that the Claims Court is authorized to grant.[6]

---

[6]    An exception to that principle is found in 28 U.S.C. §§ 2513(a)(1) and 1495, which respectively create a cause of action for money damages against the United States for "unjust conviction and wrongful imprisonment" under

Because Mr. Scott's claim does not fall within the reach of the Tucker Act, we agree with the Claims Court that it lacked jurisdiction to address his demand for damages from the United States attributable to his prosecution and incarceration by the State of Oklahoma.

## AFFIRMED

COSTS

No costs.

---

certain circumstances and confer jurisdiction on the Court of Federal Claims "for damages by any person unjustly convicted of an offense against the United States and imprisoned." That statute does not apply to state prisoners such as Mr. Scott.