**PREFERRED NATIONAL INSURANCE CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–129C.

United States Court of Federal Claims.

Dec. 2, 2002.

David A. Higley, Higley & Barfield, P.A., Altamonte Springs, Florida, attorney of record for plaintiff.

Timothy P. McIlmail, with whom were Assistant Attorney General Robert D. McCallum, Jr., Director David M. Cohen, and Assistant Director Robert E. Kirschman, Jr., Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant. Major Graeme Henderson, Air Force Legal Services Office, of counsel.

## OPINION

WIESE, Judge.

This case is before the court on defendant's motion to dismiss the complaint for

lack of subject matter jurisdiction, or, in the alternative, for summary judgment. Oral argument was heard on November 18, 2002. For the reasons set forth below, defendant's alternative motion for summary judgment is granted with respect to plaintiff's claim of duress, and defendant's motion to dismiss for lack of subject matter jurisdiction is granted with respect to all other claims.

## FACTS

Plaintiff, Preferred National Insurance Company, was a surety to a contract executed on February 27, 1991, between the United States Department of the Air Force (the Air Force) and A.W. & Associates, Inc./3M Masonry, a joint venture (the contractor). The contract was for Simplified Acquisition of Base Engineering Requirements (SABER) in connection with maintenance and repair services to be performed at Patrick Air Force Base in Florida (the SABER contract). The SABER contract was an indefinite quantity contract with a guaranteed minimum value of $200,000. After the close of the base year, the SABER contract provided for four option years, to be exercised at the Air Force's discretion. On April 18, 1991, the Air Force modified the contract to extend the base year to March 7, 1992.

In conformity with the Miller Act, 40 U.S.C. §§ 270a–270d (2000), the SABER contract mandated that the contractor obtain a performance bond with a penal sum of 100 percent of the guaranteed minimum contract value, or $200,000, and a payment bond with a penal sum of 50 percent of the guaranteed minimum contract value, or $100,000. Additionally, Paragraph H–8(c) of the contract provided that upon exhaustion of the guaranteed minimum, separate performance and payment bonds would be required for each individual delivery order over $25,000.

On March 8, 1991, the Air Force issued a blanket delivery order in the amount of $200,000. Regency Insurance Company, the initial surety to the contract, posted perfor-

mance and payment bonds in favor of the contractor, the principal obligor, in the amounts required by the SABER contract. Subsequently, on July 8, 1991, plaintiff, the follow-on surety, posted performance and payment bonds in favor of the contractor with penal sums of $300,000 and $150,000, respectively (the July bonds). On October 31, 1991, plaintiff furnished an additional set of performance and payment bonds with penal sums of $200,000 and $100,000, respectively (the October bonds). Neither the July bonds nor the October bonds included expiration dates.

In November 1991, the Air Force and the contractor agreed to delete Paragraph H–8(c) from the contract. By mutual agreement of the parties, but without involvement of the surety, that deletion was made retroactive as of October 31, 1991. On March 5, 1992, the Air Force unilaterally exercised its option to extend the contract through March 7, 1993. Plaintiff did not bill the contractor for any additional premiums after March 31, 1992.

Shortly after the Air Force exercised the first option year, subcontractors and suppliers on the SABER contract began experiencing payment problems with the contractor. The Air Force responded to their complaints of nonpayment by referring them to plaintiff as the contractor's surety. However, plaintiff's agent, Americlaim Adjustment Corporation (Americlaim), took the position that all of plaintiff's bonds had expired when the base year of the SABER contract came to a close in March 1992. Consequently, according to Americlaim, plaintiff was not liable as payment or performance surety for any delivery orders issued after that date. The Air Force did not accept Americlaim's assessment. Instead, in September 1992, the contracting officer sought assurance that the October bonds remained in effect from Michael W. Brown of Brown Insurance Agency, Inc., the individual who had acted as plaintiff's agent when the bonds were issued.[1] The substance

---

1. One of the factual issues in dispute concerns the period during which Mr. Brown was qualified to act as plaintiff's agent. Mr. Brown was plaintiff's agent when the July and October bonds were issued. However, by August 1992,

Americlaim was identifying itself as plaintiff's authorized representative in its correspondence with A.W. & Associates, Inc., and with the SABER subcontractors and suppliers. In view of the

of Mr. Brown's response is in controversy. Internal Air Force memoranda indicate that Mr. Brown stated that plaintiff's October bonds would be effective through October 31, 1992. Both plaintiff and Mr. Brown, however, claim that no such statement was made.

During the next ten months, the contractor, the Air Force, and plaintiff went back and forth on the subject of the bonds. In November 1992, A.W. & Associates, Inc., advised the Air Force that plaintiff's bonds had been valid through October 31, 1992. The Air Force then repeated this position to Mr. Brown, referring to his "verbal assurance" that the bonds had been valid through that date.

In May 1993, A.W. & Associates, Inc., filed for bankruptcy under Chapter 11 of the Bankruptcy Act. The Air Force subsequently terminated the SABER contract for default. In a June 2, 1993, letter, the Air Force notified plaintiff of the bankruptcy filing. Attached to that letter was a list of open delivery orders "covered by [plaintiff's] bonds." The delivery orders ranged in date from September 26, 1991, to May 4, 1993, and totaled in excess of $3 million. Plaintiff responded by reiterating that its bonds had expired at the end of March 1992. Again, the Air Force disagreed.

In early July 1993, the Air Force contacted plaintiff with a request that plaintiff honor its performance bond obligations by entering into a takeover agreement for the SABER contract. Plaintiff declined on the ground that it was not the "bonding company of record." In a July 15, 1993, letter, the Air Force advised plaintiff of its opinion that both the July and October bonds had been in effect through November 17, 1992. The letter explicitly identified Mr. Brown as the source of that date, stating that "Mr. Brown has always maintained your bonds were in effect through 17 Nov 92." [2] The Air Force also warned that plaintiff would be held responsible for any costs incurred as a result of its "apparent unwillingness to honor its obligations." The Air Force continued to refer

unpaid subcontractors and suppliers to plaintiff.

At some point between July 15 and August 27, 1993, the Air Force renewed its request that plaintiff take over the SABER contract. The Air Force informed plaintiff that it would seek to have plaintiff removed from the Treasury Department's approved surety list if it did not honor its performance and payment bonds.

On August 27, 1993, plaintiff and the Air Force entered into a construction contract takeover agreement. The parties agreed that plaintiff would be reimbursed from the unpaid balance of the contract price for the costs and expenses of assuming performance, and that expenses in excess of the unpaid balance would be credited against the penal limit of plaintiff's performance bond.

On October 7, 1993, plaintiff instituted an action for interpleader in the United States District Court for the Middle District of Florida pursuant to Fed.R.Civ.P. 22. Payment claims in excess of $490,000 had been submitted in connection with the SABER contract. Plaintiff also sought a declaratory judgment that the July payment bond had been "superseded and replaced" by the October payment bond, thus capping plaintiff's penal liability at $100,000. Notwithstanding this claim, however, plaintiff settled the matter out of court by making total payments of approximately $270,000.

Plaintiff filed its complaint in this court on March 12, 1999. The complaint consists of three counts. In Count I, plaintiff argues that the Air Force breached its contractual obligations by failing to enforce Paragraph H–8(c) of the contract, thus essentially extending plaintiff's liability under the existing bond to delivery orders over $25,000, *i.e.,* orders that formerly would have required additional coverage. The government continued that breach, plaintiff maintains, by modifying the SABER contract to delete Paragraph H–8(c) without plaintiff's consent and by failing to disclose its intention to delete that paragraph. Additionally, plaintiff as-

---

basis of our disposition of this case, this factual disagreement is not material.

**2.** It is not clear from the record how the Air Force arrived at this date given its previous insistence that the bonds had been valid through October 31, 1992.

serts a breach of the implied duty of good faith and fair dealing, including an argument that the takeover agreement is voidable on grounds of duress.

In Count II, plaintiff brings together several claims under the umbrella of equitable estoppel. Essentially, plaintiff alleges that given the Air Force's knowledge that it was contractually required to comply with and to enforce Paragraph H–8(c) of the contract, that consent of the surety was required in order to exercise the option-year modification, and that plaintiff had relied upon both of these requirements when providing its bonds, the United States is now estopped from enforcing the contract as modified.

Finally, in Count III, plaintiff raises a claim for pro tanto discharge, the gravamen of which is also the deletion of Paragraph H–8(c) from the contract and the Air Force's failure to disclose its intention to eliminate that provision. On the basis of these three counts, plaintiff seeks recovery of $499,132, consisting of the $270,000 paid in settlement of the interpleader action, plus its costs and attorneys fees for that action.

## DISCUSSION

The jurisdiction of the United States Court of Federal Claims is grounded in the Tucker Act, 28 U.S.C. § 1491 (2000), which waives sovereign immunity for monetary claims "against the United States founded ... upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Defendant argues that plaintiff's three counts can be reduced to a single charge of wrongful inducement: Because the government wrongly directed unpaid subcontractors and suppliers to plaintiff as payment surety, plaintiff was forced to institute and settle the interpleader action to its detriment. Wrongful inducement is a claim "sounding in tort." *Aetna Cas. & Sur. Co. v. United States,* 228 Ct.Cl. 146, 655 F.2d 1047, 1059 (1981). And because "[t]his Court does not possess jurisdiction to entertain tort claims," defendant argues, the court is obliged to dismiss plaintiff's action.

If defendant means to suggest that this court can never adjudicate a claim that can be stated as a tort, then defendant is in error. A surety that is able to demonstrate the existence of a contract-based right to bring suit against the government may come before this court notwithstanding the fact that the challenged behavior also may be described as tortious. *Fountain v. United States,* 192 Ct.Cl. 495, 427 F.2d 759, 761 (1970), *cert. denied sub. nom, Fountain v. Redevelopment Land Agency,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971); *see also Burtt v. United States,* 176 Ct.Cl. 310, 314, 1966 WL 8878 (1966) (holding that "a tortious breach of contract is not a tort independent of the contract so as to preclude an action under the Tucker Act"). As this court has observed, "[t]o foreclose consideration of such a claim merely because defendant characterizes the claim as a tort would elevate form over substance." *Dakota Tribal Indus. v. United States,* 34 Fed.Cl. 295, 297 (1995). The relevant query is whether the alleged wrongdoing is " 'so closely bound up' with the contractual relationship" that the action properly lies in contract. *Id.* at 298 (quoting *L'Enfant Plaza Prop., Inc. v. United States,* 227 Ct.Cl. 1, 645 F.2d 886, 892 (1981)). In other words, the fact that plaintiff's claims are cognizable in tort does not settle the issue; to defeat jurisdiction, plaintiff's claims also must not be cognizable in contract.

■ Although suretyship is necessarily a three-party relationship, *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160 (Fed.Cir. 1985), there is no privity of contract between the United States and the surety to a government contract, *Insurance Co. of the West v. United States,* 243 F.3d 1367, 1370 (Fed.Cir. 2001). Only two means have been identified through which such a surety can bring itself within the ambit of the Tucker Act. First, a surety may assert contract rights of its own arising out of a separate agreement to take over for a defaulting contractor. *Home Ins. Co. v. United States,* 46 Fed.Cl. 160, 162 (2000). Second, a surety may establish a right of equitable subrogation to one of the parties to the bonded contract. *Transamerica Premier Ins. Co. v. United States,* 32 Fed.Cl. 308, 311 (1994).

The doctrine of equitable subrogation allows a party that has satisfied another's debt or undertaken another's obligation to step into the shoes of the original debtor or obligor. *United States v. Munsey Trust Co.*, 332 U.S. 234, 242, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); *see also Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37, 139, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (holding that the Miller Act codified the common law right to equitable subrogation and observing that "probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed"). Thus, a payment bond surety that has satisfied the claims of unpaid subcontractors and suppliers may proceed against the government as a subrogee of the defaulted prime contractor. *Security Ins. Co. v. United States*, 192 Ct.Cl. 754, 428 F.2d 838, 843 (1970). Similarly, because the government itself would have had the right to use any unpaid portion of the contract price to pay subcontractors and laborers, a performance bond surety that takes over or finances completion of a defaulted contract may assert not only the rights of the contractor, but also the government's right to any contract retainage. *Pearlman*, 371 U.S. at 141–42, 83 S.Ct. 232; *see also Transamerica Ins. Co. v. United States*, 989 F.2d 1188, 1194 (Fed.Cir.1993); *Transamerica Premier*, 32 Fed.Cl. at 312.

Neither this court nor the Federal Circuit has recognized any other basis for Tucker Act jurisdiction over a surety to a government contract. "[I]n the absence of a takeover agreement or in the event that equitable subrogation is not applicable, no privity exists to support a claim by a surety against the Government." *Ransom v. United States*, 17 Cl.Ct. 263, 268 (1989), *aff'd*, 900 F.2d 242 (Fed.Cir.1990). The Federal Circuit has made clear that a surety has no standing to sue as a third-party beneficiary: "The surety's rights and obligations are not based on third-party beneficiary concepts, but on principles of suretyship law." *National Sur. Corp. v. United States*, 118 F.3d 1542, 1545 (Fed.Cir.1997). Hence, although a surety to a government contract may sue as a subrogee of a party to the original construction contract or may sue on a takeover contract in its own right, it may not sue on the original construction contract in its own right.

The majority of plaintiff's claims fall squarely into this forbidden zone. The complaint recites that plaintiff is a completing contractor and is in privity of contract with the United States. Both of these statements are factually correct. However, apart from its argument that the takeover contract was entered into under duress, none of plaintiff's claims are predicated on its own contractual relationship with the United States—the August 27, 1993, takeover agreement. The only other jurisdictional avenue available to plaintiff is that of equitable subrogation, and plaintiff does not invoke this doctrine. Nor could it. Plaintiff seeks to recoup the expenses incurred in the litigation and settlement of the 1993 interpleader action by arguing that the government's allegedly wrongful administration of the SABER contract forced it to assume a suretyship obligation for which it had not contracted. These plainly are not claims that the original parties to the SABER contract would be entitled to bring and therefore are not claims that plaintiff is entitled to bring as a subrogee. It is established suretyship jurisprudence that "one cannot acquire by subrogation what another whose rights he claims did not have." *Munsey*, 332 U.S. at 242, 67 S.Ct. 1599. Because these claims arise neither out of a contractual right of the surety's own nor out of a right of subrogation, they are not cognizable in contract before this court.

Defendant correctly observes that it is inconsistent for plaintiff first to have brought and settled an interpleader action in order to limit its liability and then later to seek restitution on the ground that it was not legally obligated to make those payments in the first instance. If plaintiff truly was being pressed to pay for work that it had not bonded, it should have refused payment and instead defended itself against any subsequent lawsuits, or, alternatively, sought a declaratory judgment in district court for pro tanto discharge reduction.

The rule of pro tanto discharge states that "if the obligee departed from or altered the contractual provisions relating to payments and/or the security of retained funds, a surety is discharged to the extent it can show injury, loss, or prejudice." *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 497 (Fed.Cir.1990). In *National Surety*, 118 F.3d at 1544, the Federal Circuit recognized the applicability of this rule in the government contract context: "[A] surety bond embodies the principle that any material change in the bonded contract, that increases the surety's risk or obligation without the surety's consent, affects the surety relationship." Specifically, a surety will be discharged entirely from its obligations where the change to the underlying agreement is cardinal, *i.e.*, amounts to a substituted contract or imposes fundamentally different risks on the surety than those to which it had agreed. Where the alteration is less than cardinal, the surety's obligation "is reduced to the extent of loss due to the modification." *Id.; see also* Restatement (Third) of Suretyship & Guaranty § 37 (1996). Plaintiff's decision to opt for an out-of-court resolution of the unpaid subcontractors' and laborers' claims renders these legal remedies unavailable. If it settled claims that it was not obligated to pay, then plaintiff voluntarily assumed those debts.

■ As noted, only plaintiff's claim that the takeover agreement was obtained by duress passes jurisdictional muster. Defendant responds that it is not duress for a federal official to state an intention to request removal of a surety from a list of approved sureties for government contracts. The court agrees. Because duress is a fact-intensive inquiry, *Fruhauf Southwest Garment Co. v. United States*, 126 Ct.Cl. 51, 111 F.Supp. 945, 951 (1953), "[a] comprehensive definition of the circumstances constituting duress is impossible," *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 531 F.2d 1037, 1042 (1976). However, certain indicia of duress are well established. To establish duress, a plaintiff must show: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." *Fruhauf*, 111 F.Supp. at 951; *see also Systems Tech. Assoc., Inc. v. United States*, 699 F.2d 1383, 1386 (Fed.Cir.1983).

In *Employers Ins. of Wausau v. United States*, 764 F.2d 1572 (Fed.Cir.1985), the Federal Circuit confronted a substantially similar set of circumstances. Plaintiff Employers Insurance was performance bond surety to a contract providing for the cutting and removal of timber from federal land. The prime contractor defaulted and the government was forced to resell the uncut timber at a loss. A dispute arose as to whether the surety's bond covered not only cut timber but also uncut timber, rendering Employers Insurance liable for the government's loss. After the Forest Service stated that it intended to seek removal of Employers Insurance from the Treasury Department's list of approved sureties, Employers Insurance acquiesced to the government's demand for payment. The surety then brought suit to recover that payment as having been made under duress. The Claims Court granted summary judgment for the United States and the Federal Circuit affirmed. The appellate court noted that other alternatives, such as delay, had been available to the surety and distinguished coercive acts from threats to undertake remedial measures to which the putative payee has a legal right. *Id.* at 1576. Finally, the court emphasized the fact that "[s]urety companies are experienced in dealing with government, financially strong, and not easily pushed around." *Id.*

Plaintiff herein points to no facts that differentiate its argument from that of the surety in *Employers Insurance*. Rather than entering into the takeover agreement, plaintiff could have sought a declaratory judgment in federal district court that it was not "the bonding company of record." The Air Force committed no wrong in threatening to request delisting for cause. *See Johnson, Drake & Piper*, 531 F.2d at 1043 ("It is not duress to threaten to make good faith use of the remedies prescribed under a contract."). Plaintiff's argument that it was particularly susceptible to the Air Force's threat because delisting might have put it out of business is unconvincing. Unless the defendant is re-

sponsible for creating particularly stressful business conditions, the focus of the duress inquiry is the wrongful nature of the allegedly coercive behavior, not its possible financial consequences on the plaintiff. "Some wrongful conduct must be shown, to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity." *La Crosse Garment Mfg. Co. v. United States*, 193 Ct.Cl. 168, 432 F.2d 1377, 1382 (1970). "[Economic] pressure, even the threat of considerable financial loss, is not the equivalent of duress." *International Tel. & Tel. Corp. v. United States*, 206 Ct.Cl. 37, 509 F.2d 541, 550 n. 11 (1975).

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted with respect to plaintiff's claim of duress, and defendant's motion to dismiss for lack of subject matter jurisdiction is granted with respect to all other claims. The Clerk is directed to enter judgment accordingly. No costs.