L. Tim **WAGNER**, Liquidator of Amwest Surety Insurance Company, In Liquidation, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 03–1418C.

United States Court of Federal Claims.

June 21, 2006.

■■■■■■■■■■■■■■■■■■

Douglas J. Schmidt, Blackwell Sanders Peper Martin, LLP, Kansas City, Missouri, for plaintiff. Michael D. Fielding, Blackwell Sanders Peper Martin, LLP, Kansas City, Missouri, of counsel.

E. Kathleen Shahan, Trial Attorney, John W. Showalter, Assistant Director, J. Christopher Kohn, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This case is before the Court on plaintiff's motion for summary judgment ("Pl.'s Mot.," docket entry 47) and defendant's motion to dismiss plaintiff's amended complaint or, in the alternative, cross-motion for summary judgment ("Def.'s Mot.," docket entry 48), each filed on December 22, 2005.[1] Plaintiff, the court-appointed liquidator for Amwest Surety Insurance Company ("Amwest") in Liquidation,[2] seeks to avoid and recover alleged preferential transfers made by Amwest to or for the benefit of defendant during the year preceding the filing of the petition seeking to place Amwest in liquidation. Plaintiff alleges that Amwest made such preferential transfers pursuant to, or as a result of, its obligations under Miller Act[3] performance and payment bonds that it issued as surety to certain government construction contractors. The parties filed responses to the respective motions ("Pl.'s Resp.," docket entry 50; "Def.'s Resp.," docket entry 51) on Janu-

---

1. On November 8, 2005, the Court held a telephonic status conference in which the parties proposed and the Court adopted a schedule that provided for simultaneous briefing of the parties' motions.

2. Most of the events relevant to this case occurred before Amwest was placed in liquidation. The Court will specifically refer to "Amwest in Liquidation" when appropriate.

ary 20, 2006. Defendant and plaintiff filed replies on February 10, 2006 ("Def.'s Reply," docket entry 53) and February 14, 2006 ("Pl.'s Reply," docket entry 52). For the reasons set forth below, defendant's motion to dismiss is GRANTED IN PART with respect to plaintiff's claims arising out of payments to subcontractors pursuant to the payment bonds. The Court DEFERS RULING on plaintiff's motion for summary judgment and defendant's motion to dismiss or, in the alternative, cross-motion for summary judgment[4] insofar as those motions relate to the remaining claims and counterclaims asserted by the parties in this action pending supplemental briefing, as described *infra* in Part III of the Discussion section.

## BACKGROUND

Plaintiff commenced this action on June 6, 2003. On December 22, 2004, the Court denied defendant's motion to dismiss for want of jurisdiction insofar as the motion was directed toward plaintiff's claims based on express or implied contracts with the United States that allegedly incorporated the terms of certain provisions of the Nebraska Insurers Supervision, Rehabilitation and Liquidation Act, NEB.REV.STAT. §§ 44–4801 to – 4862 (2004) ("the Act"). *Wagner v. United States*, No. 03–1418C (Fed.Cl. Dec.22, 2004). The Court granted defendant's motion insofar as it was directed toward plaintiff's claims based directly on the Act. *See id.* Defendant filed its answer to plaintiff's amended complaint on January 18, 2005, in which defendant asserted three counterclaims. On April 26, 2005, the Court granted plaintiff's motion to dismiss defendant's "Third Contingent Counterclaim" for failure to state a claim upon which relief can be granted. *See Wagner v. United States*, No. 03–1418C (Fed.Cl. Apr.26, 2005). On June 28, 2005, the parties

---

3. 40 U.S.C. §§ 3131–3134 (2000 & Supp. III 2003).

4. The Court anticipates that it will treat defendant's motion as a cross-motion for summary judgment, rather than as a motion to dismiss for failure to state a claim upon which relief can be granted, with respect to all claims and counterclaims that remain to be adjudicated after the Court's rulings set forth in this Opinion and Order.

reported that plaintiff would no longer pursue preference actions relating to certain bonds referenced in the amended complaint in accordance with the terms of a settlement agreement with a third party. As noted above, the parties filed the pending motions on December 22, 2005.

## I. Facts

On December 22, 2005 the parties also jointly filed their Stipulations ("Stip.") of the material facts in this case. The parties have not indicated to the Court that any material facts are in dispute, and the parties rely exclusively upon the facts set forth in the Stipulations (and the exhibits appended thereto, "Ex.") in support of their respective motions.

Amwest is a Nebraska corporation that was in the business of issuing payment and performance bonds to contractors, including Miller Act bonds to federal government construction contractors. Stip. 98–99. Amwest was insolvent by, at the latest, June 30, 2000 and remained insolvent through June 7, 2001. Stip. 100. On June 6, 2001, the State of Nebraska, on behalf of plaintiff (the Director of Insurance of the State of Nebraska), filed a petition for order of liquidation in the District Court of Lancaster County, Nebraska, pursuant to the Act, seeking to have Amwest placed into liquidation. *See* Stip. 101, Ex. 101. The court entered an Order of Liquidation authorizing the liquidation of Amwest on June 7, 2001. Stip. 102. The order appointed plaintiff as the statutory liquidator of Amwest in Liquidation. *Id.*

### A. The Lackland/Amex Project, Bonds, and Takeover Agreement

On June 30, 1998, the United States Army Corps of Engineers ("USACE"), Fort Worth District, awarded Contract No. DACA63–98–C–0021 ("Amex Contract") to Amex Construction Consultants, Inc., dba Amex Construction ("Amex") for the construction of a Blood Donor Center at Lackland Air Force Base, Texas ("Lackland Project"). Stip. 4. On July 6, 1998, Amwest issued Miller Act performance and payment bonds, both numbered 1363155, naming Amex as the principal and defendant as the obligee. Stip. 5.

USACE received a letter from Amex on May 11, 2000, by which Amex informed USACE that it could not pay its obligations and entered into a voluntary default. Stip. 6. Prior to June 8, 2000, USACE made demand upon Amwest for completion of the work in accordance with the performance bond. Stip. 8. On June 8, 2000, USACE, Amex, and Amwest executed a Takeover, Novation and Partial Release Agreement ("Takeover Agreement") in which Amwest assumed the performance obligations of Amex under the Amex Contract. Stip. 9, Ex. 9. Pursuant to the Takeover Agreement, USACE issued Modification P00016 to the Amex Contract on June 13, 2000, changing the prime contractor from Amex to Amwest. Stip. 11. Also on June 13, 2000, Amwest entered into a completion contract with Eaton Contracting Company, Inc. ("Eaton") for completion of the Amex Contract. Stip. 10. Between August 23, 2000 and May 11, 2001, Amwest paid $957,074.95 to Eaton under the completion contract that Amwest entered into pursuant to the Takeover Agreement. Stip. 17, 20. Altogether, Amwest paid $651,346.43 to Amex's subcontractors pursuant to its payment bond between July 26, 2000 and May 11, 2001. Stip. 12, 20.

On June 8, 2001 Amwest in Liquidation abandoned work on the Lackland Project and, by letter of June 11, 2001, informed USACE that Amwest had been declared insolvent and placed in liquidation. Stip. 21–22. Pursuant to an understanding reached between Amwest in Liquidation and the Government, the Government issued modification P00028 extinguishing Amwest's right to complete the work. Stip. 23, Ex. 23. USACE then negotiated a completion contract with another contractor. Stip. 24, Ex. 24. USACE incurred excess completion costs in the amount of $197,599.72 as a result of Amwest's default. Stip. 25. The contracting officer issued a final decision determining that Amwest was liable to the United States for excess reprocurement costs in the amount of $197,599.72, and making demand for that amount, on January 16, 2002. Stip. 26, Ex. 26. Neither Amwest nor plaintiff appealed the final decision of the contracting officer. Stip. 27. USACE filed a proof of

claim in the Amwest liquidation proceeding for $195,599.72 [5] on July 11, 2002. Stip. 28.

### B. The Reno Trucking Project and Bonds

On April 17, 2000, the United States Department of Agriculture, Natural Resources Conservation Service ("NRCS") awarded Contract No. 50–4423–0–7291 ("Reno Contract") to Reno Trucking & General Contracting ("Reno") for road construction in Hernando, Mississippi. Stip. 29. On May 22, 2000, Amwest issued Miller Act performance and payment bonds, both numbered 127001828, naming Reno as the principal and defendant as the obligee. Stip. 30. Work under the Reno Contract was substantially complete by December 11, 2000, but Reno did not return to complete the project. Stip. 31. Defendant made no demands upon Amwest under the performance bond, nor did Amwest make any payments to defendant under the performance bond. Stip. 33. Amwest paid a total of $88,863.32 to Reno's subcontractors under the payment bond on May 7, 2001. Stip. 38; see Stip. 34–37.

### C. The Fort Rucker/Oliver Project and Bonds

On September 28, 1998, the United States Department of the Army awarded Contract No. DABT01–98–C–0017 ("Oliver Contract") to Oliver Construction, Inc. ("Oliver") for renovation of a building at the United States Army Aviation Center, Fort Rucker, Alabama ("Fort Rucker Project"). Stip. 39. On September 28, 1998, Amwest issued Miller Act performance and payment bonds, both numbered 1376679, naming Oliver as the principal and defendant as the obligee. Stip. 40. Final inspection of the Fort Rucker project was completed on July 2, 2000, but Amwest thereafter received payment bond claims from Oliver's subcontractors and suppliers. Stip. 41, 43. Between February 9, 2001 and April 11, 2001, Amwest paid a total of $140,030.08 to Oliver's subcontractors under the payment bond. Stip. 44, 47. Defendant made no demands upon Amwest under

the performance bond and Amwest made no payments to defendant under the performance bond. Stip. 46.

### D. The Rock Island/Ash I Project, Bonds, and Tender Agreement

On July 8, 1998, USACE, Rock Island District, awarded Contract No. DACA25–98–C–0020 ("Ash I Contract") to Ash Painting, Inc. ("Ash") for the repair and painting of a government bridge structure at Rock Island, Illinois. Stip. 48, Ex. 48. On July 15, 1998 Amwest issued Miller Act performance and payment bonds, both numbered 1344076, naming Ash as the principal and defendant as the obligee. Stip. 49. The Army terminated Ash for default on July 28, 2000. Stip. 51. On or about July 28, 2000, USACE called upon Amwest to complete the requirements of the Ash I contract. Stip. 52. On October 27, 2000, USACE and Amwest executed a Tender Agreement for Performance and Completion of Contract and Release of Performance Bond ("Tender Agreement"). Stip. 53. Pursuant to the Tender Agreement, Amwest directly paid defendant $1,500,000.00 by check dated December 4, 2000. Stip. 54. Defendant, for its part, entered into a contract with a replacement contractor that Amwest had tendered, assumed responsibility for all costs and obligations of contract administration, released Amwest from all claims arising out of or relating to the Ash I contract and the performance bond, and agreed to pay the replacement contractor sufficient funds to satisfy the claims of two subcontractors for work performed under the Ash I contract. Id. Amwest paid a total of $324,435.62 to subcontractors pursuant to the payment bond between July 6, 2000 and May 16, 2001. Stip. 56.

### E. The Weslaco/H.J. Group Ventures Project, Bonds, and Takeover Agreement

On July 2, 1997, the United States Department of Agriculture, Agriculture Research Service ("ARS") awarded Contract No. 50–

---

5. Plaintiff believes that defendant made a typographical error on the claim it filed in the liquidation proceeding because the claim amount is exactly $2,000 less than the actual costs incurred. Pl.'s Mot. at 13 n. 54.

3K15–7–8217 ("H.J.Contract") to H.J. Group Ventures, Inc. ("H.J.") for the construction of a building in Weslaco, Texas ("Weslaco Project"). Stip. 58. On July 15, 1997, Amwest issued Miller Act payment and performance bonds, both numbered 1337467, naming H.J. as the principal and defendant as the obligee. Stip. 59. The contracting officer terminated H.J. for default on December 16, 1998 and defendant subsequently demanded that Amwest complete the work in accordance with its obligations under the performance bond. Stip. 63–64. On March 1, 1999, ARS and Amwest entered into a Takeover Agreement pursuant to which Amwest agreed to procure performance of all work and other obligations under the H.J. Contract. Stip. 65. The same day, ARS and Amwest executed a Completion Contract (Contract No. 50–3K15–9–8309) under which Amwest became the prime contractor for completion of the H.J. Contract. Stip. 66. Also on March 1, 1999, Amwest executed a Completion Agreement with Mitchell Enterprises, Inc. ("Mitchell") to complete that work. Stip. 67. Amwest paid Mitchell a total of $2,595,538.17 for work performed pursuant to the Completion Agreement, but Amwest paid only $143,363.57 of this amount during the one-year period preceding the liquidation petition. Stip. 74–75; Pl.'s Mot. at 14. Between August 30, 2000 and December 4, 2000, Amwest paid a total of $106,072.45 to subcontractors pursuant to the payment bond. Stip. 71, 75.

### F. The Hickman/Ash II Project and Bonds

On March 30, 1998, the United States Air Force ("USAF"), 15th Contracting Squadron, awarded Contract No. F645605–98–C0009 ("Ash II Contract") to Ash for the maintenance and repair of the interiors of military housing at Hickman Air Force Base, Hawaii ("Hickman Project"). Stip. 76. On April 7, 1998, Amwest issued Miller Act performance and payment bonds, both numbered 1347111, naming Ash as the principal and defendant as the obligee. Stip. 77. The Ash II Contract was substantially complete by May 2000 and defendant made no demand upon Am-

west pursuant to the performance bond. Stip. 78–79. Amwest paid a total of $41,000 to one subcontractor pursuant to the payment bond on April 25, 2001. Stip. 80–81.

### G. The Commerce/Contracting Ventures Project, Bonds, and Takeover Agreement

On January 14, 1997, the United States Department of Commerce, National Oceanic and Atmospheric Administration ("NOAA") awarded Contract No. 50WCNA706011 ("Contracting Ventures Contract") to Contracting Ventures, Inc. ("Contracting Ventures") for construction of a weather forecast office in Juneau, Alaska ("Commerce Project"). Stip. 82. On January 15, 1997, Amwest issued Miller Act performance and payment bonds, both numbered 1321065, naming Contracting Ventures as the principal and defendant as the obligee. Stip. 83. NOAA terminated Contracting Ventures for default on August 25, 1998 and demanded that Amwest complete the work in accordance with its performance bond on August 28, 1998. Stip. 87–88. On February 26, 1999, Amwest and defendant entered into a Takeover Agreement by which Amwest assumed the performance obligations of the Contracting Ventures Contract. Stip. 89. NOAA issued modification 0022 to the Contracting Ventures Contract, changing the prime contractor to Amwest on November 11, 1999. Stip. 90. Between October 27, 2000 and November 22, 2000, Amwest paid a total of $20,667.00 to its subcontractors for work performed under the Takeover Agreement. Stip. 95. Amwest paid $31,263.28 to subcontractors pursuant to the payment bond between August 29, 2000 and February 7, 2001. Stip. 93.

### II. Nature and Categories of Plaintiff's Claims and Defendant's Counterclaims

In his brief in support of his motion for summary judgment, plaintiff has helpfully separated his claims into three discrete categories for purposes of analysis under the Nebraska preferential transfer statute.[6]

---

6. Plaintiff's amended complaint also separates

plaintiff's claims into two counts. Count I con-

Plaintiff claims that he is entitled to recover from defendant: the payment Amwest made directly to the Government pursuant to the Rock Island Project Tender Agreement ("Category 1" claim); the payments Amwest made to completion contractors and Amwest's own subcontractors for work done pursuant to the three Takeover Agreements ("Category 2" claims); and payments Amwest made to subcontractors of the original construction contractors pursuant to its payment bonds ("Category 3" claims). Plaintiff asserts that those payments constitute avoidable preferential transfers under Nebraska law and that the relevant Nebraska statute became a part of Amwest's payment and performance bonds, the Tender Agreement and the Takeover Agreements with the Government. As to all claims, plaintiff asserts jurisdiction under the Tucker Act, 28 U.S.C. § 1491.

The Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act provides:

> (1)(a) A preference shall mean a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the insurer within one year before the filing of a successful petition for liquidation under the Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act the effect of which transfer may be to enable the creditor to obtain a greater percentage of such debt than another creditor of the same class would receive. If a liquidation order is entered while the insurer is already subject to a rehabilitation order, such transfers shall be deemed preferences if made or suffered within one year before the filing of the successful petition for rehabilitation or within two years before the filing of the successful

> petition for liquidation, whichever time is shorter.
>
> (b) Any preference may be avoided by the liquidator if:
>
> (i) The insurer was insolvent at the time of the transfer [or];
>
> (ii) The transfer was made within four months before the filing of the petition. . . .

NEB.REV.STAT. § 44-4828(1). The Act further provides: "Every person receiving any property from the insurer or the benefit thereof as a preference voidable under subsection (1) of this section shall be personally liable therefor and shall be bound to account to the liquidator." § 44-4828(11)(b). Plaintiff argues that these provisions of the Act were incorporated into the performance and payment bonds, the Tender Agreement and the Takeover Agreements by operation of law. *See* Pl.'s Mot. at 4-5. Plaintiff argues that all of the payments in the three categories, in light of the factual circumstances surrounding them, satisfy the elements of an avoidable preferential transfer under the Act and, therefore, defendant is contractually bound to return the amount of those payments to the liquidator. *See id.* at 5-18.

The total amount of plaintiff's Category 1 claim is $1,500,000.00. *Id.* at 10. The Category 2 claims amount to $1,121,105.52 (Lackland Project—$957,074.95, Weslaco Project—$143,363.57, and Commerce Project—$20,667.00). *Id.* at 15. The Category 3 claims total $1,378,111.18 (Lackland Project—$651,346.43, Reno Trucking Project—$88,863.32, Fort Rucker Project—$140,130.08, Rock Island Project—$324,435.62, Weslaco Project—$106,072.45, Hickman Project—$41,000, and Commerce Project—$31,263.28, and deducting a $5,000 settlement with one subcontractor). *Id.* at 17-18 and n. 92. Altogether, plaintiff claims

---

sists of alleged preferential transfers that occurred within the four-month period preceding the filing of the Amwest liquidation petition. Am. Compl. ¶¶ 79–88. Count II includes alleged preferential transfers that occurred during the period of more than four months through twelve months preceding the filing of the liquidation petition. Am. Compl. ¶¶ 89–99. The relevance of this distinction appears to be that under NEB. REV.STAT. § 44-4828(1)(b)(ii), a showing that a preferential transfer occurred within four

months of the filing of a successful liquidation petition is one of four alternative grounds upon which the preference becomes avoidable, and it is unnecessary to show that the insurer was insolvent at the time of the transfer. The second such alternative applicable to plaintiff's claims is that the transfer occurred within one year of the filing of a successful liquidation petition and the insurer was insolvent at the time of the transfer. § 44-4828(1)(b)(i). The distinction is not relevant to the issues addressed herein.

an overall entitlement of $3,999,216.70. *Id.* at 2.

As a result of the Court's April 26, 2005 Opinion and Order, two of defendant's three counterclaims remain for adjudication. In its First Counterclaim, defendant asserts that, in the event the Court determines that plaintiff is entitled to recover any funds in this lawsuit, defendant is entitled to set off against the amount of the judgment certain debts allegedly owed to the Government by Amwest in Liquidation, as evidenced by certain proofs of claim that federal agencies have filed in the Amwest liquidation proceeding.[7] In its Second Counterclaim, defendant asserts that it is entitled to judgment in the amount of $197,599.72 for excess reprocurement costs resulting from Amwest's default under the Lackland Takeover Agreement in accordance with the decision of the contracting officer assessing such excess reprocurement costs, which neither Amwest nor plaintiff appealed.

### DISCUSSION

### I. Standard of Review

Plaintiff has moved for summary judgment on its claims and on defendant's counterclaims pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). Defendant has moved to dismiss plaintiff's amended complaint pursuant to RCFC 12(b)(1) and 12(b)(6) or, in the alternative, has made a cross-motion for summary judgment pursuant to RCFC 56. In this Opinion and Order the Court adjudicates only plaintiff's claims arising out of payments by Amwest to subcontractors pursuant to Miller Act payment bonds (the Category 3 claims), which plaintiff alleges constituted avoidable preferential transfers that he is entitled to recover from defendant. These claims present a question of the Court's subject matter jurisdiction.

Pursuant to RCFC 12(b)(1), the Court is required to grant defendant's motion to dismiss if it finds that it does not possess juris-

diction over plaintiff's claim. The parties, or the court *sua sponte,* may challenge subject matter jurisdiction at any time, including on appeal. *Folden v. United States,* 379 F.3d 1344, 1354 (Fed.Cir.2004) (citing *Fanning, Phillips & Molnar v. West,* 160 F.3d 717, 720 (Fed.Cir.1998)); *Booth v. United States,* 990 F.2d 617, 620 (Fed.Cir.1993). Once jurisdiction is challenged, the plaintiff bears the burden of establishing jurisdiction. *Holland v. United States,* 57 Fed.Cl. 540, 550 (2003) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). When deciding a motion to dismiss, the court must assume that all undisputed facts alleged by the non-moving party are true and must draw all reasonable inferences in the non-movant's favor. *Mexican Intermodal Equip., S.A. de C.V. v. United States,* 61 Fed.Cl. 55, 59 (2004) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). When the facts regarding jurisdiction are in dispute, the court may consider all relevant evidence in order to resolve factual disputes, including evidentiary matters outside the pleadings. *Wilson v. United States,* 58 Fed. Cl. 760, 762 (2003) (citing *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985)).

### II. The Court Lacks Jurisdiction over Plaintiff's Claims Arising Out of the Payment Bonds (Category 3 Claims)

Defendant asserts that Amwest and the United States were not in privity of contract with respect to the payment bonds and, therefore, this Court has no jurisdiction over plaintiff's claims seeking to avoid and recover, as preferential transfers, payments that Amwest made to subcontractors pursuant to its obligations under the payment bonds. *See* Def.'s Mot. at 10–13; Def.'s Reply at 6–9. Plaintiff responds that the Court has jurisdiction over the payment bond claims because the Government was an intended third-

---

7. The First Counterclaim seeks to set off against any judgment for plaintiff in this case the $197,599.72 in excess reprocurement costs that defendant also seeks to recover in its Second Counterclaim and, in addition, seeks to set off four other claims asserted by three federal agencies other than USACE that total $622,686.91. Thus, the total asserted setoff amounts to $820,286.63. *See* Ans. to Am. Compl. & Countercl., First Countercl. ¶¶ 1–6.

party beneficiary of the payment bonds. *See* Pl.'s Resp. at 7–11. (Defendant does not contest plaintiff's assertion that the payment bonds incorporated the relevant Nebraska law pertaining to preferential transfers, but rather challenges the materiality of that assertion. *See* Def.'s Resp. at 4; Def.'s Reply at 4–5.) Even if plaintiff is correct that the Government was an intended third-party beneficiary of the payment bonds, the Government's status as such would not bring the payment bond claims within the Court's jurisdiction.

■ The Tucker Act, 28 U.S.C. § 1491(a), provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2000). Generally, in order to maintain an action founded upon contract under the Tucker Act, the contract in question must be between the plaintiff and the Government, that is, privity of contract must exist between the plaintiff and the United States. *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998) (quoting *Ransom v. United States,* 900 F.2d 242, 244 (Fed.Cir.1990) and citing *Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984)). "The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity." *Id.* (citing *Nat'l Leased Hous. Ass'n v. United States,* 105 F.3d 1423, 1436 (Fed.Cir.1997)). "A finding of privity between the Plaintiff and the Government is a jurisdictional prerequisite for a contract claim because 'the government consents to be sued only by those with whom it has privity of contract.'" *Cent. Transp. Int'l, Inc. v. United States,* 63 Fed.Cl. 336, 338 (2004) (quoting *Globex Corp. v. United States,* 54 Fed.Cl. 343, 347 (2002)). "[P]rivity of con-

tract with the government [is a] question[ ] of subject matter jurisdiction that cannot be conceded to by a party." *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1328 n. 3 (Fed.Cir.2005) (citing *Chancellor Manor v. United States,* 331 F.3d 891, 899 (Fed.Cir.2003)).

■ In *Preferred National Insurance Co. v. United States,* Judge Wiese of this court summarized the applicable law relating to the court's jurisdiction over claims by Miller Act sureties:

> Although suretyship is necessarily a three-party relationship, *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160 (Fed. Cir.1985), there is no privity of contract between the United States and the surety to a government contract, *Insurance Co. of the West v. United States,* 243 F.3d 1367, 1370 (Fed.Cir.2001). Only two means have been identified through which such a surety can bring itself within the ambit of the Tucker Act. First, a surety may assert contract rights of its own arising out of a separate agreement to take over for a defaulting contractor. *Home Ins. Co. v. United States,* 46 Fed.Cl. 160, 162 (2000). Second, a surety may establish a right of equitable subrogation to one of the parties to the bonded contract. *Transamerica Premier Ins. Co. v. United States,* 32 Fed. Cl. 308, 311 (1994).

*Preferred Nat'l Ins. Co. v. United States,* 54 Fed.Cl. 600, 603–04 (2002). "Neither this court nor the Federal Circuit has recognized any other basis for Tucker Act jurisdiction over [a claim by] a surety to a government contract." *Id.* at 604. The payment bond claims in this case do not arise out of or involve the Tender Agreement or the Takeover Agreements between Amwest and the Government or any other contractual relationship creating privity between Amwest and the Government (in contrast to the Category 1 and 2 claims discussed in Part III, *infra,* which do arise out of the Tender Agreement and the Takeover Agreements). Nor does plaintiff assert that the Court has jurisdiction over the payment bond claims under the doctrine of equitable subrogation.[8]

---

8. Because plaintiff does not rely upon the doc-  trine of equitable subrogation, the proper course

Plaintiff instead seeks to establish jurisdiction founded upon an "express or implied contract with the United States" on the ground that where the Government is an intended third-party beneficiary of a contract, a party to the contract may assert a Tucker Act claim against the United States. Pl.'s Resp. at 8. Plaintiff states that, to his knowledge, "neither this Court nor the Federal Circuit has ever addressed the issue whether this Court has jurisdiction for a claim brought against the Government where the Government is an intended third-party beneficiary of a contract between two private entities." *Id.* at 7–8. Assuming *arguendo* that the Government is a third-party beneficiary of the payment bonds,[9] the Tucker Act does not confer jurisdiction over plaintiff's payment bond claims on that basis.

According to the Federal Circuit, "[i]n order to sue for damages on a contract claim, a *plaintiff must have* either direct privity or third-party beneficiary status." *Alpine County, Cal. v. United States,* 417 F.3d 1366, 1368 (Fed.Cir.2005) (citing *Anderson v. United States,* 344 F.3d 1343, 1352 (Fed.Cir.2003)) (emphasis added); *see Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1263 (Fed.Cir. 2005) ("One such exception [to the privity requirement] allows suit against the government *by an intended third-party beneficiary* despite the lack of privity." (emphasis added)); *First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed.Cir.1999) ("[D]espite lack of privity, we have held that suits may be brought against the government in the Court of Federal Claims *by an intended third-party beneficiary* .... " (emphasis added)). The exception to the privity requirement described by the Federal Circuit in these cases encompasses only suits by intended third-party beneficiaries of government contracts against the Government as a party to the contract. It

is to dismiss the payment bond claims for lack of subject matter jurisdiction (unless plaintiff has established another valid basis for such jurisdiction). *See Preferred Nat'l,* 54 Fed.Cl. at 604 (dismissing surety's claims for lack of subject matter jurisdiction where "none of plaintiff's claims [were] predicated on its own contractual relationship with the United States" and plaintiff did not invoke "[t]he only other jurisdictional avenue available ... that of equitable subrogation.") Conceivably, plaintiff could have asserted that it was subrogated to the rights of the prime contractors by virtue of its payments to subcontractors pursuant to the payment bonds and therefore was in privity with the Government at least with respect to prime contractor claims. *See Commercial Cas. Ins. Co. of Ga. v. United States,* 71 Fed.Cl. 104 (2006); *Liberty Mut. Ins. Co. v. United* States, 70 Fed.Cl. 37 (2006); *Nova Cas. Co. v. United States,* 69 Fed.Cl. 284 (2006) (all holding that a payment bond surety is subrogated to the rights of both the prime contractor and the subcontractor when it pays a subcontractor pursuant to a payment bond). Even if plaintiff had made such an assertion, however, the payment bond claims in this case would still fail, either for lack of subject matter jurisdiction or on the merits on summary judgment, because plaintiff is not asserting rights of the prime contractors against the Government. Nor is plaintiff seeking to recover contract funds that the Government retained or improperly disbursed to the prime contractor (*i.e.,* funds for which the Government was a stakeholder) after notice from the surety of the prime contractor's default. *See Balboa,* 775 F.2d at 1161–63; *Capitol Indem. Corp. v. United States,* 71 Fed.Cl. 98 (2006). Rather, plaintiff asserts the surety's own alleged rights arising from the payment bonds themselves, which the parties agree incorporated Nebraska law pertaining to preferential transfers, but to which the Government was not a contractual party. The prime contractors never possessed, pursuant to their contracts, a right to avoid and recover any preferential transfers made by Amwest and "it is elementary that one cannot acquire by subrogation what another whose rights he claims did not have." *United States v. Munsey Trust Co. of Wash., D.C.,* 332 U.S. 234, 242, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); *see Preferred Nat'l,* 54 Fed.Cl. at 604 ("These plainly are not claims that the original parties to the [government] contract would be entitled to bring and therefore are not claims that plaintiff is entitled to bring as a subrogee."). Plaintiff, therefore, rightly has not asserted equitable subrogation as a basis for its payment bond claims.

9. This is a dubious assumption:

> In contrast to a performance bond, which is intended to protect the government, a payment bond is intended to protect persons supplying labor and materials to the contractor. Thus, the government is the intended third party beneficiary of the performance bond and the subcontractors and suppliers of a contractor are the intended third party beneficiaries of the payment bond.

*Fireman's Fund Ins. Co. v. United States,* 909 F.2d 495, 499 n. * (Fed.Cir.1990) (internal citation omitted); see 40 U.S.C. § 3131(b)(2) (2000 & Supp. III 2003) (requiring payment bonds "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract....").

does not authorize suits against the Government by a party to a private contract on the basis that the Government is an intended beneficiary of the private contract. First, although the parties to a contract incur an enforceable duty to an intended third-party beneficiary of the contract, the beneficiary makes no return promise and incurs no duties by virtue of the contract. *See Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 500 (Fed.Cir.1990) (noting that although the Government was identified as the third-party beneficiary of a performance bond, it did not "undertake any obligation to [the surety] in [the bond]."). Second (and more important to the jurisdictional issue confronting the Court), a rule allowing claims against the Government on the basis that it is a third-party beneficiary of a private contract would conflict with the plain language of the Tucker Act. The Act grants this court jurisdiction over claims founded "upon any express or implied contract *with the United States*." 28 U.S.C. § 1491(a)(1) (emphasis added). Where the Government is a third-party beneficiary of a contract between two private parties, there is no "contract with the United States." *Id.* In light of the clear statutory language and the admonition that "the government does not lightly consent to suit," *Flexfab*, 424 F.3d at 1263, the Court cannot construe the Tucker Act as granting the consent of the Government to claims against it arising out of a contract between private parties, even where the parties intend that the Government will benefit from the contract.[10] The Tucker Act, therefore, does not waive the Government's sovereign immunity or confer jurisdiction as to claims founded upon such a theory.

Here, Amwest was not in privity of contract with the Government with respect to the payment bonds and does not assert jurisdiction over claims arising from the payment bonds based upon equitable subrogation. As plaintiff has invoked no valid basis for jurisdiction over his claims for the recovery of alleged preferential transfers made pursuant to the payment bonds, defendant's motion to dismiss must be granted as to those claims (*i.e.*, the Category 3 claims).

### III. The Court Defers Ruling on the Pending Motions Insofar as They Relate to Plaintiff's Claims Arising out of the Tender Agreement (Category 1 Claim) and the Takeover Agreements (Category 2 Claims) and Defendant's Counterclaims, Pending Supplemental Briefing

There is no question that the Court possesses subject matter jurisdiction over plaintiff's claims arising out of the Tender Agreement and the Takeover Agreements because those agreements were contracts between Amwest and the United States. In addition, in view of the parties' stipulations setting forth the relevant facts, the Court is satisfied that these claims can be decided as a matter of law based upon the existing factual record. However, the issue whether the Tender Agreement and the Takeover Agreements incorporated the relevant provisions of the Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act is central to plaintiff's Category 1 and 2 claims, and the Court must address this issue before it can evaluate the merits of plaintiff's claims based upon the terms of the Act. In contrast to their agreement that the performance and payment bonds incorporated the relevant provisions of the Nebraska statute, the parties disagree as to whether the Tender Agreement and the Takeover Agreements did the same. *See* Def.'s Reply at 5–6. Defendant's position appears to be that the performance and payment bonds were contracts of insurance and therefore incorporated the relevant provisions of the Act, but the Tender Agreement and the Takeover Agreements constituted neither contracts of insurance nor the business of insurance, and therefore did not incorporate the Act's provisions. *See id.* Although the parties discussed this issue to some degree in their briefs, the Court believes that both the parties and the Court

---

10. *Plaintiff* does not assert that Amwest was an intended third-party beneficiary of any government contract. Furthermore, "The Federal Circuit has made clear that a surety has no standing to sue as a third-party beneficiary: 'The surety's rights and obligations are not based on third-party beneficiary concepts, but on principles of suretyship law.'" *Preferred Nat'l*, 54 Fed.Cl. at 604 (quoting *Nat'l Sur. Corp. v. United States*, 118 F.3d 1542, 1545 (Fed.Cir.1997)).

would benefit from limited further briefing, such that the parties' discussion will not be constrained by the need to address the many other issues presented in this case. The Court therefore ORDERS that the parties shall file supplemental briefs, not to exceed twenty (20) pages in length, addressing the following questions:

1) Did the provisions of the Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act that underlie plaintiff's claims in this case constitute binding and enforceable terms and conditions of (1) the Tender Agreement between Amwest and the Government for the Rock Island Project and (2) the Takeover Agreements between Amwest and the Government for completion of the Lackland, Weslaco, and Commerce Projects? Please explain the bases for your answer.

2) Assuming the answer to Question 1 is in the negative, what, if any, basis remains for plaintiff to recover from defendant in this action on plaintiff's claims arising out of the Tender Agreement (Category 1 claim) and the Takeover Agreements (Category 2 claims)?

3) Assuming the answer to Question 1 is in the affirmative, what, if any, bases remain for defendant to defeat plaintiff's claims in this action arising out of the Tender Agreement (Category 1 claim) and the Takeover Agreements (Category 2 claims) *other than* the arguments already set forth by defendant that the payments made by Amwest do not satisfy the statutory elements of an avoidable preferential transfer (argument heading II in defendant's response, docket entry 51) and that the Government received no preferential transfers from Amwest (argument heading III in defendant's response)?

The Court will defer ruling on the pending motions insofar as they relate to plaintiff's Category 1 claim and Category 2 claims pending this supplemental briefing. The Court will also defer ruling on the pending motions insofar as they relate to defendant's remaining counterclaims, in part because the Court need only address defendant's First Counterclaim if plaintiff prevails on the merits of any of its claims. The parties shall also address the following question regarding defendant's Second Counterclaim in their supplemental briefs:

4) The final decision of the contracting officer determined that Amwest is liable to the United States for excess reprocurement costs for completion of the Lackland Project. Is that decision, which was not timely appealed by Amwest or by plaintiff, alone sufficient to establish defendant's entitlement to a judgment for those excess reprocurement costs in this Court? *See* 41 U.S.C. §§ 605(a)-(b), 606, 609(a)(1), (3). Please cite relevant authorities in support of your position. Please set aside, for the purposes of this question, plaintiff's argument that NEB.REV.STAT. § 44–4829 precludes such a judgment and address only whether the contracting officer's final decision would otherwise entitle defendant to judgment in its favor on its Second Counterclaim under applicable federal law.

The Court may order oral argument on any issue relating to any claim or counterclaim remaining to be decided in this action should the Court conclude that such argument would be beneficial.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is GRANTED IN PART with respect to plaintiff's claims arising out of payments that Amwest made to subcontractors pursuant to its payment bonds (Category 3 claims). The Court DEFERS RULING on plaintiff's motion for summary judgment and defendant's motion to dismiss or, in the alternative, cross-motion for summary judgment insofar as those motions relate to the remaining claims and counterclaims asserted by the parties in this action pending supplemental briefing addressing the questions set forth above. The Court hereby ORDERS that plaintiff shall file and serve his initial supplemental brief by **Friday, July 7, 2006** and defendant shall file and serve its response to plaintiff's supplemental brief by **Friday, July 21, 2006.** Plaintiff shall file and serve a reply to defen-

dant's response, not to exceed ten (10) pages, by **Friday, July 28, 2006.**

IT IS SO ORDERED.